[Civ. No. 11732. Third Dist. Dec. 19, 1967.]

MID-WAY CABINET FIXTURE MANUFACTURING,
Plaintiff and Appellant, v. COUNTY OF SAN JOAQUIN
et al., Defendants and Respondents.

Forrest E. Macomber and A. Grant Macomber for Plaintiff and Appellant.

Richard W. Dickenson, County Counsel, Gerald A. Sherwin and John F. Cheadle, Deputy County Counsel, for Defendants and Respondents.

PIERCE, P. J.—Petitioner Mid-Way Cabinet Fixture Manufacturing (Mid-Way) appeals from a judgment denying its petition for mandate to compel San Joaquin County (county) and its planning director to grant a use permit for building purposes minus allegedly invalid conditions imposed by the county, to wit: conveyance to the county of certain interests in real estate. Mid-Way owns real property between Stockton and Lodi on the northeast corner of Eight Mile Road

and West Lane. West Lane runs north and south. Mid-Way's frontage thereon is 466 feet. Eight Mile Road runs east and west. Mid-Way's frontage on that road is 240 feet. Mid-Way operates a cabinet shop on the northerly portion of this property. The southerly portion is unimproved. Its original shop was built in 1959 under an unconditional use permit. The property has access to both roads but the shop's principal access is onto West Lane near the northwest corner of the property, and its parking area is located there. The use permit it seeks now is to enlarge its present operation by the construction of a small (16 feet by 44 feet) addition to its present shop and by constructing another building 48 feet south of its present shop. The size of the latter building (100 feet by 100 feet) would approximate in size the existing shop. (*Neither building would have any direct effect upon the county's future plans for either West Lane or Eight Mile Road.*) The county has adopted a "Precise Plan" to convert West Lane into a four-lane expressway. The plan will involve the construction of an interchange at the West Lane-Eight Mile Road intersection. Mid-Way's property will lie within a "bulb" of that intersection. Construction of that bulb will entail Mid-Way's loss of all-point direct access both to West Lane on the west and to Eight Mile Road, and substituted access will be via a "return" road 50 feet wide extending from a "Y" off of and onto West Lane at the northwest corner of the Mid-Way property, thence easterly along the north boundary thereof to the northeast corner, thence southerly along the east boundary to Eight Mile Road. A curve in the road where it takes off from West Lane in the northwest corner of the Mid-Way property and another curve where the north (east-west) leg of the "return" road meets the east (or north-south) leg would be taken from Mid-Way. It would also lose 25 feet along its east boundary. (The other 25 feet would be acquired from Mid-Way's neighbor to the east —expectantly by gift.) The "Precise Plan" was adopted October 29, 1963. In January 1964 a proceeding in eminent domain was commenced by the county to condemn certain access rights from Mid-Way and both lands and access rights from other landowners involved. (This condemnation action is still pending.) When, in April 1966, Mid-Way sought by use permit to enlarge its cabinet shop, the county, at the suggestion of its planning department, tacked conditions onto the granting of a use permit. These conditions were: that Mid-

Way without compensation (1) convey to the county its access rights to West Lane and Eight Mile Road, and (2) convey to the county the lands for the construction of the "return" road as shown on a map in evidence (and as described above). As a concession Mid-Way would be allowed to retain its direct access rights to West Lane and Eight Mile Road until the four-lane expressway was constructed.[1]

Midway made a counteroffer. It offered to convey the access rights and lands demanded but with a right of reversion in the event the West Lane expressway construction (under the "Precise Plan") was not commenced within three years. That counteroffer was unacceptable to the county. Both the supervisors and members of the planning commission expressed uncertainty regarding the timetable of the expressway construction. There is, in the record, a marked vagueness as to when funds therefor might be expected to become available. The assistant director of Public Works made the statement that "the theory of the precise plan, of course, is that the adjacent owners will be asked to develop the land for the frontage roads *and intersections* to conform to that plan and the County to build the four-lane facility." (Italics added.) The "Precise Plan" does, in fact, adopt that theory. There was a breakdown of negotiations and this action followed.

The trial court heard no evidence. It based its findings and its judgment on the record of the proceedings before the planning commission and board of supervisors. That record is before this court. Two of the court's findings are as follows:

"21. At said hearing before the Planning Commission, there was sufficient and substantial evidence introduced to allow the Planning Commission to reasonably conclude that the use permit, if granted, would substantially increase the vehicle traffic on West Lane and Eight Mile Road as a result of vehicles coming to and going from the subject property.

"22. At said hearing before the Planning Commission there was sufficient and substantial evidence introduced to allow the Planning Commission to reasonably conclude that if the use permit were granted, the traffic burden which the use of the subject property under the use permit would place upon Eight Mile Road and West Lane would be substantially

---

[1] It is noteworthy that the recommendation of the staff of the county's planning department had been that a third condition be exacted: that Mid-Way should be required to *build* the "return" road. The recommendation was not expressly rejected; but it was not included in the resolution adopted.

greater than the traffic burden which is being placed on said roads as the result of the existing uses of neighboring properties which are zoned Interim Highway Frontage.''

 Our reading of the record of all hearings—those before the planning commission as well as those before the supervisors—gives not the slightest hint that there would be an appreciable increase in traffic. On the contrary, other than an inconsequential increase of truck deliveries from a possibly expanded cabinet shop output there will be no effect at all. Mid-Way's business is not retail. Neither the planning commission, its staff, nor the supervisors evinced any concern regarding present congestion of traffic or the possibility that that traffic would be enhanced because of proposed enlargement of the cabinet shop. In the immediate vicinity the area is mostly agricultural, although there are some farm houses, a few residences and a dairy some distance away. The purpose of the conversion of West Lane into an expressway was to create another highway between Stockton and Lodi to the west of and paralleling U.S. 99. (A third north-south highway still further west is involved.) Someday, in the unfixed and unstated future, Eight Mile Road would be a link between these roads. No present plan covers the construction of the latter road. Not only were the public officials unconcerned regarding increased traffic because of Mid-Way's operation; they were unconcerned about area-produced traffic increases, period. On the contrary, the attitude of the planning commission was this: West Lane had been widened in 1964. At that time Mid-Way's existing cabinet shop had had to be moved. This had entailed considerable county expense. At the hearing before the planning commission, defendant planning director expressed the view: ''I think it's about time we got some performance from them.'' The position of the board of supervisors was that because adjoining landowners generally benefit by an enhancement in the value of their lands when an expressway is constructed, such landowners should fairly be asked to *give* access rights and lands over which the highways are built. Therefore, whenever a zoning ordinance (and particularly the ''use permit'' granting or withholding power therein written) permits, the granting of a use permit should be conditioned upon free conveyances.[2] That is the

---

[2]Under San Joaquin's Zoning Ordinance No. 850, Mid-Way's property is zoned ''Interim Highway Frontage Zone.'' That classification permits certain uses including single and two family dwellings and enumerated

position of respondents here. We hold that they overestimate the extent of their powers.

### EMINENT DOMAIN VERSUS THE POLICE POWER

 Neither the federal government nor the state may commandeer private property. The federal government is prohibited from doing so under the Fifth Amendment of the United States Constitution: "nor shall private property be taken for public use, without just compensation." Such prohibition against the state is set forth in article I, section 14 of the California Constitution: "Private property shall not be taken or damaged[3] for public use without just compensation." The state is also prohibited by the Fourteenth Amendment of the United States Constitution, since "without due process of law" has come to include "without just compensation." (Kratovil-Harrison, *Eminent Domain—Policy and Concept* (1954) 42 Cal.L.Rev. 596, 597.)

Theoretically, not superimposed upon but coexisting alongside the power of eminent domain is the police power, unwritten except in case law. It has been variously defined—never to the concordant satisfaction of all courts or legal scholars—and frequently it has been inconsistently applied by different courts (Michelman, *Property, Utility, and Fairness, Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165; Kratovil-Harrison, *op.cit.*, p. 608); sometimes, to our belief, by the same court. The police power is described more readily than it can be defined. It has been said to be no more "than the powers of government inherent in every sovereignty . . . the power to govern men and things within the limits of its dominion." (*Nebbia* v. *New York,* 291 U.S. 502, 524 [78 L.Ed. 940, 949, 54 S.Ct. 505, 89 A.L.R. 1469].) ". . . The broad and all-pervading scope of . . . [the police] power makes a satisfactory defini-

---

agricultural uses "unless otherwise provided in this Ordinance." It also permits "commercial and industrial uses," "subject to an approved use permit." By section 6.1 "Use permits may be approved, approved subject to conditions, or denied in conformity with adopted policies of the Commission." Under section 6.4, where conditions are imposed, they must be "reasonable."

[3]The addition of "or damaged" by the California Constitution of 1879 has been held to be meaningful. (*Eachus* v. *Los Angeles* (1900) 130 Cal. 492, 495 [62 P. 829, 80 Am.St.Rep. 147]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 357 [144 P.2d 818].) But actually, as we see it, " 'Taking' is . . . constitutional law's expression for any sort of publicly inflicted private injury for which the Constitution requires payment of compensation." (Michelman, *op. cit.,* p. 1165.)

tion of it impossible." (*Western Indem. Co.* v. *Pillsbury* (1915) 170 Cal. 686, 694 [151 P. 398].) In *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 413 [67 L.Ed. 322, at page 325, 43 S.Ct. 158, 28 A.L.R. 1321], Justice Holmes says for the court: "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every change in the general law. As long recognized, some values are enjoyed under an implied limitation. and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts." In the *Pennsylvania Coal Co.* case the conflicting rights involved were the right under a specified statute to mine coal, the result of which would be to undermine and damage a house on the surface. The Supreme Court denied the right absent payment of "just" compensation. During the course of the opinion Justice Holmes says (on p. 326 of 67 L.Ed.): "The rights of the public in a street purchased or laid out by eminent domain are those that it has paid for. . . . The protection of private property in the 5th Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the 14th Amendment. [Citation.] When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

". . . It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go—and if they go beyond the general rule, whether they do not stand as much upon tradition as upon principle. [Citation.] In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. [Citation.] We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818], held that, against an encroachment by the state, the easement of access of a landowner with frontage upon a street extended to the nearest intersecting street in both directions. The concurring opinion of Justice Edmonds recognized ''a large area'' within which government might act in the name of the police power but says (on p. 357) : ''So far as the construction of improvements is concerned, however, even though their purpose be to promote and insure the public safety and convenience, the right of the State to take 'private property' without the payment of 'just' compensation has been expressly forbidden by both the eminent domain provision of the state Constitution and the due process clause of the Fourteenth Amendment to the Constitution of the United States. [Citations.] Obviously, under these provisions, if the State appropriates the land itself for a public use, it is exercising its power of eminent domain with a corresponding liability to pay the owner the value of the land.'' The opinion stated that not all instances of a *diminution of value* were compensable. It said (on p. 358 of 23 Cal.2d) : ''. . . In considering this problem, the court must weigh the relative interests of the public and the individual, so as to arrive at a just balance in order that government will not be unduly restricted in the proper exercise of its function for the public good, while at the same time giving due effect to the policy in the eminent domain clause. . . .'' Justice Traynor dissented from the conclusion reached in the *Bacich* case. He conceded, however, (on p. 369 of 23 Cal.2d) that if plaintiff had a property right in the nature of an easement then ''compensation must be paid for the impairment of that easement.''

 Zoning ordinances which are reasonable, not arbitrary in operation, have long been upheld as a legitimate exercise of the police power. (*Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] ; *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 337 [175 P.2d 542].) Zoning ordinances, however, rest in the field of regulation. Generally that is where the police power does operate. (*Rose* v. *State of California*, 19 Cal.2d 713, 730 [123 P.2d 505] ; *Beckley* v. *Reclamation Board* (1962) 205 Cal. App.2d 734, 750 [23 Cal.Rptr. 428]—hearing denied.) They are concerned with the uses of property, not its taking. Sometimes they may, as in the case of other governmental exercises of the police power, result in uncompensated diminution of value of property. Diminution of value, however, while a

factor in the determination of whether an attempted exercise of the police power is proper is not the sole, and sometimes not the vital, factor. It was stated by Justice Traynor in his concurring opinion in *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, at pages 396-397 [153 P.2d 950] : ". . . The decisive consideration is the effect of the public improvement on the property and whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking. It is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose to which the improvement is dedicated, since the measure of liability is not the benefit derived from the property, but the loss to the owner." The first sentence of the statement above quoted is substantially repeated by our Supreme Court in *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, at page 642 [220 P.2d 897]. (See also, *Beckley* v. *Reclamation Board, supra,* 205 Cal.App.2d 734, 750.)

Under the principles already announced, it would seem there could be no doubt that the county through its planning commission and board of supervisors was attempting to avoid the constitutional guarantee of payment of just compensation via the method of exacting "conditions" to the granting of a use permit arbitrarily inspired and that in doing so it had exceeded its powers. Respondents rely, however, upon a series of cases commencing with *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503], holding that under specified circumstances a public agency may compel the dedication of land as a condition properly imposed in the exercise of the police power. Ayres was a case in which plaintiff sought to develop a 13-acre subdivision and sought approval from the city of his plan. The city imposed conditions upon approval of the plan. These included a dedication of a 10-foot strip abutting an existing street so that it would be widened to conform to the surrounding district; also other conditions were imposed, the effect of which reasonably could be said to eliminate traffic hazards which the proposed subdivision otherwise would present. The next case upon which respondents rely is *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86 [4 Cal.Rptr. 493, 351 P.2d 765]. There plaintiff owned four acres. The property, devoted to an excavation business, fronted on a public avenue. The area was zoned for agricultural purposes. Plain-

tiff had been granted a five-year variance which had expired. He asked for and was granted another five-year variance but only upon condition that he dedicate an easement of 30 feet for the widening of the street. *There was no transcript in the record.* The court said (on p. 88) that ''A variance sanctions a deviation from the standard set by the general zoning ordinance, and the granting of a variance rests largely in the discretion of the body designated by the ordinance for that purpose.'' The court, adopting the presumption (from a silent record) that an official duty has been properly performed and that the board had acted upon sufficient facts— also analogizing the case to the *Ayres* case—held that ''a street that might be adequate for the needs of an agricultural area might be inadequate if part of the area is to be used for another purpose.''[4] (Pp. 88-89.) The *Bringle* case has been followed. In *Southern Pac. Co.* v. *City of Los Angeles* (1966) 242 Cal.App.2d 38 [51 Cal.Rptr. 197], it was cited to support a holding requiring the plaintiff railroad to dedicate a strip of land for street widening purposes as a condition to a grant of a right to build a warehouse on property adjoining the street. There it appeared (on p. 41) ''the warehouse in question will generate increased traffic . . . and will further congest traffic by the addition of railway lines to service the same: and that the required dedication will not cause petitioner undue hardship or financial loss.'' The court, however, cautioned, quoting from *Kissinger* v. *City of Los Angeles* (1958) 161 Cal. App.2d 454, 462 [327 P.2d 10] (hearing denied) at page 42: '' 'A zoning ordinance may not be used as a device to take property for public use without the payment of compensation.' '' ■ In *Gong* v. *City of Fremont* (1967) 250 Cal. App.2d 568, 575 [58 Cal.Rptr. 664], the three cases discussed above are cited and the following dictum is stated: '' [T]he courts have no authority to interfere with the denial of a variance or use permit except upon a clear and convincing showing of fraud, illegality or abuse of discretion.'' The court (on p. 575) expressly withholds ruling on the

---

[4] A law student has criticized *Bringle* (13 Hastings L.J. 401). He said that the fact that the street widening had been planned *before* the variance was sought plus the fact that the land had been about to be condemned showed ipso facto that ''the taking was nothing other than a veiled attempt to seize property about to be condemned without paying.'' The criticism is unsound. The facts assumed do not necessarily add up to the conclusion. As we shall show, an additional fact must be added to the sum to justify a finding of unconstitutional arbitrariness. It was not shown to be present in *Bringle*. It is shown here.

validity of the conditions there attached to the use permit. A still more recent case is *Sommers* v. *City of Los Angeles* (Sept. 1967) 254 Cal.App.2d 605 [62 Cal.Rptr. 523], where again the constitutionality of a zoning ordinance was unsuccessfully challenged, this time with relation to conditions placed upon the issuance of a building permit for a service station. The court stated at page 610 that "every intendment is in favor of the validity of zoning legislation since it represents an exercise of the police power by the legislative body." It also stated that although courts may differ with zoning authorities there would be no judicial interference where "reasonable minds might differ." The court concluded, under the facts of that case, that reasonable minds *could* differ, stating that the evidence had shown that the service station would benefit materially from the conditions imposed and that its owner would suffer no "undue hardship or financial loss" from their imposition. It had also been established that, but for imposition of the conditions, a material enhancement of already congested traffic conditions would result.

As stated in the appeal before us, no evidence was taken in the trial court. It had the same record before it which we have. An able judge wrote an able opinion, citing, in the main, the same cases we have cited. Nevertheless, in making the findings we have quoted above, we think he read into the record facts which we cannot find here. ■ Courts do not lightly interfere with public agencies to whom regulatory police powers have been conferred. It is our obligation to do so, however, when unreasonable or arbitrary action becomes manifest. ". . . Whether there has been a reasonable exercise of this [police] power is a court question." (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.* (1953) 40 Cal.2d 436, 440 [254 P.2d 29].) Abuse of discretion by a local administrative body is established if the decision is not supported by substantial evidence in light of the whole record. (Code Civ. Proc., § 1094.5, subd. (b).) ■ It is clear to us from this record that the conditions imposed upon Mid-Way are not so imposed because of any of its activities relating to that portion of the sometime-to-be-built four-lane expressway which intersects Eight Mile Road and places Mid-Way in a "bulb" of that intersection. They were imposed because respondents seem to conceive that the burden of the cost of access and highway widening rights of way and the cost of interchanges generally can be shifted by government

onto adjoining landowners. It was stated by a supervisor (who ultimately moved the adopted resolution): "But we were talking about a very large length of land that can be split and developed into other uses. I don't think the County should finance the construction of the frontage road for the development and use of other commercial establishments that could take place on that vacant land on the corner." That is a frank expression (echoed by other members of the agency) that the public need not resort to eminent domain at all to obtain rights of way for highways whenever it can find an adjoining landowner who needs something from government—whether it be a variance, a use permit or a building permit. But in this context it has been stated by Professor Michelman (*op.cit.*, p. 1181): "[A]ny measure which society cannot afford or, putting it in another way, is unwilling to finance under conditions of full compensation, society cannot afford at all." The purpose which respondents seek to accomplish here is not the purpose for which zoning ordinances are properly designed; the cases relied upon by respondents do not give an unrestrained power to impose "conditions." Justification of conditions depends upon there being some real relationship between the thing wanted by the landowner from government and the quid pro quo exacted by government therefor.

There is, as stated, a pending dormant condemnation action against Mid-Way. If Mid-Way's property by lying within this interchange bulb will enjoy special benefits, the Legislature has fixed the extent to which they can be offset and has declared that the landowner shall be entitled to have a jury assess them. (Code Civ. Proc., § 1248, subd. 3; see *People* ex rel. *Dept. Public Works* v. *Bond* (1964) 231 Cal.App.2d 435 [41 Cal.Rptr. 900, 13 A.L.R.3d 1142].)

Various factors are taken into consideration by courts in determining whether in a given situation there is a proper exercise of the police power, in which case, as shown above, the landowner must yield "uncompensated obedience" (*Gray* v. *Reclamation Dist. No. 1500,* 174 Cal. 622, 642 [163 P. 1024]), or whether a governmental exercise of the power of eminent domain is masquerading in the guise of the police power. The determining factor, as we have seen, is *fairness.* (See Michelman, *op. cit.,* 1218 et seq.) The cases cited by respondent do not dissuade us from a firm belief that here there was manifest unfairness.

The judgment is reversed with directions to the trial court to issue the peremptory writ.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied January 15, 1968, and respondents' petition for a hearing by the Supreme Court was denied February 14, 1968.