533 P.2d 693

**TRANSAMERICA TITLE INSURANCE COMPANY, a corporation, as Trustee under Trust No. 27,215, Appellant,**

v.

**The CITY OF TUCSON, a Municipal Corporation, et al., Appellees.**

**No. 2 CA–CIV 1667.**

Court of Appeals of Arizona, Division 2.

April 9, 1975.

Rehearing Denied May 7, 1975.

Review Denied June 17, 1975.

**386**

Schorr & Karp, P. C., by S. Lenwood Schorr, Tucson, for appellant.

James D. Webb, Tucson City Atty., by Enos P. Schaffer, Deputy City Atty., Tucson, for appellees.

## OPINION

HOWARD, Chief Judge.

As a condition of rezoning, can a municipality require the landowner to dedicate part of his land for right-of-way purposes? That is the main issue to be decided by this appeal.

Appellant is the owner of vacant land located at the southeast quadrant of the intersection of Silverbell Road and Speedway Boulevard in Tucson, Arizona. This property consists of approximately 196,000 square feet. The northern three-fourths of the property is zoned B–1 ⸱which permits commercial usage. The southern one-fourth of the property is zoned R–1 for residential use. Appellant requested and was granted a change of zoning on the southern quarter from R–1 to B–1. However, the rezoning granted requires, as conditions precedent, that appellant deed to the City a 75-foot one-half right-of-way for Speedway for the entire northerly portion of the land already zoned B–1 and a 60-foot one-half right-of-way for Silverbell Road on the westerly side of all the property. There are other conditions designed to buffer the subject property from existing residential property.

In granting the conditional zoning, the Mayor and Council found that the rezoning would permit a "greater impact on the traffic" on Speedway and Silverbell and:

"4. That the governing body would be discriminating as to property owners throughout the city who as a condition to rezoning which increases traffic demands and friction are historically required to dedicate additional right-of-way to meet the standard widths of the Tucson Master Plan for major thoroughfares.

5. That, in particular, the governing body would be discriminatory and unfair to the property owners directly across Speedway who had a parallel fact situation. . . ."

Both before the Mayor and Council and in the trial below, appellant presented two

plans, Plan S and Plan S–1. Plan S shows how the property can be utilized as a shopping center under the present zoning. In Plan S the improvements are located toward the center of the property with parking spaces located in the front, rear and sides of the improvements. Under Plan S the area sought to be rezoned is used for parking, a permissible R–1 use. Plan S provides 274 parking spaces and has one entry and exit for ingress and egress to Speedway and one entry and exit for ingress and egress to Silverbell.

Plan S–1 shows the development of the property after rezoning. The main difference between Plan S and Plan S–1 is that under S–1 the improvements are located to the rear of the property on the land presently zoned R–1 and the parking is mostly to the front of the improvements. Plan S–1 provides for one entry and exit on Speedway and one entry and exit on Silverbell. It has twenty less parking spaces than Plan S.

A Rezoning Development Plan is required by Section D5 of the Rules and Regulations of the City Planning and Zoning Commission. Section D7 provides that final plans for building permits shall substantially comply with the approved tentative plan.

Appellant did not object to the conditions designed for buffering or the dedication of the one-half right-of-way for Silverbell Road along the property adjacent to Silverbell which was being rezoned. It did object, however, to the other dedication demanded and filed an action for declaratory judgment in superior court.

The trial court made findings of fact and conclusions of law and entered its judgment in favor of appellees. Among the court's findings were:

"13. The right-of-way dedications required in this case are reasonably related to the proposed use under the rezoning.

14. The proposed use under the rezoning will increase traffic on the streets bordering the plaintiff's property.

15. The proposed use of the property under the rezoning will increase traffic turbulence on the streets."

Appellant has presented nine questions for review, six of which in essence relate to the reasonableness of the conditions. The remaining questions concern the admissibility of certain evidence and the sufficiency of the evidence.

██ At the outset it should be noted that a zoning ordinance is cloaked with a presumption of validity. City of Phoenix v. Price, 18 Ariz.App. 144, 500 P.2d 1132 (1972); Peabody v. City of Phoenix, 14 Ariz.App. 576, 485 P.2d 565 (1971). Further, the appellate court must accept the trial court's findings unless they are demonstrated to be clearly erroneous. Olson . v. State, 12 Ariz.App. 105, 467 P.2d 945 (1970). When the reviewing court is left with a definite and firm conviction that the trial court has made a mistake in its findings of fact and such findings are clearly erroneous, it may set them aside. Park Central Develop. Co. v. Roberts Dry Goods, Inc., 11 Ariz.App. 58, 461 P.2d 702 (1969).

 The City of Tucson in the exercise of its police power may do those acts which promote public convenience or general prosperity, as well as public safety, health, and morals. The police power is based on the necessity to safeguard the public interest. Its concept is not static, but dynamic, changing and accommodating to the complexities of modern society

██ Because of the nature of the police power, its exercise frees a governmental body from liability for compensation for resulting private losses. Montgomery v. Health Dept., 161 Cal.App.2d 584, 326 P.2d 886 (1958); 6 E. McQuillin, The Law of Municipal Corporations § 24.06 (1969). However, exercise of the police power does not include the power of eminent domain. Article 2, § 17 of the Constitution of Arizona, A.R.S., provides:

" * * * No private property shall be taken . . . for public or private use

without just compensation having first been made, or paid into court for the owner . . . ."

■ The police power cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property. House v. Flood Control Dist., 25 Cal.2d 384, 153 P.2d 950, 952 (1944). An arbitrary, conceived exaction will be nullified as a disguised attempt to take private property for public use without resort to eminent domain. Mid-way Cabinet Fixture Mfg. v. County of San Joaquin, 257 Cal. App.2d 181, 65 Cal.Rptr. 37 (1967). A strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

■ The power of a municipality to impose conditions on zoning or rezoning has been upheld. Ayres v. City Council, 34 Cal.2d 31, 207 P.2d 1 (1949); Scrutton v. County of Sacramento, 275 Cal.App.2d 412, 79 Cal.Rptr. 872 (1969). We agree with these cases. The power to impose conditions on rezoning is an exercise of the police power and such conditions are valid as long as the conditions are reasonably conceived. The fulfillment of public needs emanating from the proposed land use is the sine qua non of the exaction's reasonableness. Scrutton v. County of Sacramento, supra.

In Ayres, approval of a subdivision was conditioned on dedication of land for street-widening and a planting strip. There was evidence that the subdivision would create conditions which required the widening, the restriction of ingress and egress, and the screening of lot owners from traffic noise and fumes emanating from the subdivision.

In Scrutton v. County of Sacramento, supra, the landowner sought to have her property rezoned from agricultural to multiple family residential to permit its development for residential apartment units. Among the conditions imposed by the county was the requirement that Mrs. Scrutton dedicate a 27-foot right of way for widening a street called Foster Way which bordered the east side of her property and that she pave Foster Way at her own expense (amounting to $13,000). Mrs. Scrutton objected to dedicating and paving the Foster Way frontage since the sole vehicular access to her planned apartment development was by means of the street bordering the northern part of her property. The county's sole justification for the Foster Way requirements was that they would benefit Mrs. Scrutton's property. Summary judgment was granted in the county's favor. In reversing the summary judgment, the court commented on the affidavits filed by the county:

"They contained no showing that Mrs. Scrutton's apartment project would generate traffic or other conditions on Foster Way which would reasonably necessitate widening and improving the street at her sole expense." 79 Cal.Rptr. at 880

All the cases which we have cited are relied upon by the city in defending the judgment of the trial court.

A planning session was held in 1971 prior to the public rezoning hearing. Mr. Lim, Director of Planning for the city gave the following reason for the requested dedications:

"Mr. Chairman, the Commission requested from Staff the Speedway at Silverbell traffic. In consultation with the Traffic Engineer the latest average daily count at Speedway and Silverbell was on the order of 9,691 cars per day. On Speedway itself, it is on the order of 2,429 to about 2,972. On any thoroughfare, whether it be major or minor, when you get to the position of having 9,000 cars average daily traffic, it is to the best interest of the community that the street be widened beyond the thirty foot street where it is now, and if possible go to at least four lanes. Once the average daily traffic gets above 10,000 and in the or-

der of 12,000 to 14,000 and on up, then one starts thinking about six lanes. Before that one starts thinking about a median divider. I think, based on this, the staff request on that particular zoning case was in order, and because of the advent of the Junior College, the transition at St. Mary's, we can expect to see the 9,000 daily traffic go up to very shortly on the order of 12,000 to 14,000."

We note no mention of the increased traffic hazards resulting from the rezoning.

At the subsequent public meeting of the Mayor and Council at which the conditional rezoning was granted, the following question and answer is cited by appellees as showing justification for the conditions:

"Councilman Kennedy: Mr. Lim, has there been any past precedent set on this type of case? I seem to remember one— I think it was on Swan Road, if I recall. I don't know whether we had a legal opinion at that time that we couldn't require the right-of-way. It had something to do with a man whose mother owned the property and we were trying to take the right-of-way from them. Actually, he had some control. There is a similarity.

Mr. Lim: Mr. Mayor, Mr. Kennedy, I can't recall the exact precedence (sic). However, in the development of a piece of land all under one ownership, it is Staff's opinion and the Planning and Zoning Commission's opinion that, upon the development of a piece of land in which one is going to increase the traffic and one is going to increase the hazards along with that traffic, that the developer, in order to not only for his own good and for the community's good, should make provisions for that extra traffic that he is going to generate as a result of that development. It is·under this theory in which the Planning and Zoning Commission has asked Mr. Schorr's client for the right-of-way so that in the future—and we know it's coming—that Speedway, which is now carrying on the order of 9,000 cars per day, within the next 18 months will carry over 11,000 cars per day and, if the west side develops as we anticipate, we can look to 20 to 25,000 cars per day. This amount of traffic at Speedway and Silverbell would be extremely hazardous if this land is developed as Mr. Schorr says with a fair-sized shopping center. The intersection is hazardous now and it will be that much more. Without the additional right-of-way, we would not be able to control the traffic to any extent."

The problem with Mr. Lim's answer is that it fails to point out to the Mayor and Council that appellant already had the right without the rezoning to construct a fair-sized shopping center. In fact, from the parking standpoint, Plan S provides for 20 more customer parking spaces than Plan S-1.

The evidence at trial does not improve the city's position. Its *sole* evidence on the issue of increased traffic hazards necessitated by the rezoning other than evidence previously mentioned, came from Mr. Lim's testimony. He stated: (1) the traffic generation between Plan S and S-1 would be approximately the same, numerically; (2) there is a possibility that under S-1 a greater proportion of the traffic would be generated on Speedway; (3) S-1 would "throw" less traffic on Silverbell than S; (4) the layout of S-1 is much nicer and more attractive than S; and (5) Plan S would create less customer traffic than Plan S-1 because parking to the rear of a shopping center is not as attractive to the customer as full parking to the front. (This seems to contradict his statement that Plan S and Plan S-1 would generate approximately the same amount of total traffic.)

Appellant presented the testimony of Mr. Dennis Wall who holds a Bachelor's Degree in Architecture from Oklahoma State University and a Master's in Planning from the University of Arizona. It was his opinion that Plan S would have a greater impact on the Speedway traffic based on the "theory of intervening opportunities."

This theory is that as the proximity to the street increases, opportunities occur more frequently for the passing motorist and thus increase the frequency that such motorist would drive into the shopping area. This in turn would create more traffic turbulence, i. e. cars slowing down to enter the shopping center and cars pulling into the street from the center.[1] He further opined that as far as traffic generation was concerned, there was little difference between Plan S and Plan S–1 but that Plan S–1 would cause less traffic turbulence than Plan S.

■ The relationship between the conditions exacted by the city and the use proposed by appellant presented a factual inquiry for the trial court. The burden was on appellant to show such lack of relationship in order to overcome the presumption of validity. We believe appellant did this. The Mayor and Council and the trial court went astray in failing to distinguish between the requested rezoning and appellant's ability to build a shopping center on the property *without* the rezoning. It is true that the placing of a shopping center on the rezoned property will create an additional traffic burden on the adjacent streets. But this increased burden was already in existence under Plan S. There is no evidence that the rezoning of the land in question will cause any appreciable burden on the streets over and above that which would emanate from the land *prior to rezoning*. The testimony from Mr. Lim that there is a *possibility* that Plan S–1 would generate *more* traffic on Speedway is too vague to justify what appears to be a thinly disguised attempt to secure private property without the payment of just compensation.

When all the city's evidence is put together, it shows that the daily traffic count is approximately 9,691 cars per day at the intersection of Silverbell and Speedway, that the present traffic count requires that the street be widened to four lanes. Because of St. Mary's Hospital and Pima Community College the daily traffic count will shortly reach a point where six lanes will be needed. The intersection of Silverbell and Speedway is now hazardous. The development of a fair-sized shopping center will add to the hazards of the intersection. Plan S–1 might possibly generate more traffic on Speedway than Plan S. In every rezoning case the city requests the amount of right-of-way needed to provide the width required by the master plan.

Keeping in mind the fact that appellant already could have built a shopping center on the existing zoning, we ask again, is the widening of the streets necessitated by the rezoning? We think not. Because of factors unconnected with the development of the property Speedway and Silverbell already needed widening. The city's testimony that Plan S–1 would generate "more" traffic than Plan S does not prove anything. Five hundred and two cars are "more" than five hundred cars. If the city is relying on the traffic increase as a justification for the exaction of the right-of-way it must show an *appreciable*[2] increase in traffic which in turn cause or add to control or safety problems on the existing streets. No such testimony was adduced in this case.

The city attempts to justify its action by what appellant terms the "ipso facto" theory of reasonableness. The theory goes like this: More intensive use can be made of B–1 zoned property than property zoned R–1, ergo, more traffic will be generated on the adjacent streets, ergo, the conditions are reasonable. Under this theory the city isolates the property to be rezoned and views

---

1. On the issue of increased traffic burden as a justification for dedication of right-of-way, see Sommers v. City of Los Angeles, 254 Cal.App.2d 605, 62 Cal.Rptr. 523 (1967).

2. See Mid-way Cabinet Fixture Mfg. v. County of San Joaquin, supra. "Our reading of the record . . . gives not the slightest hint that there would be an *appreciable* increase in traffic." (Emphasis added) 65 Cal. Rptr. at 39.

it in a vacuum. This cannot be done. If the property is rezoned, Plan S–1 must, according to the rules of the Planning and Zoning Commission, be followed as closely as possible. We therefore must focus on the property as it will be utilized under Plan S–1 and refuse to follow the city's bootstrap argument. Findings of fact 13, 14 and 15 are clearly erroneous.

■ Appellant's contention that the court erred in admitting, over its objection, the dedication required by the city on the property across Speedway from appellant's property and in admitting into evidence other instances in which the city required dedication of a right-of-way is well-taken. Whether the city reasonably exercised its police power in these other cases is not relevant.

The conditions requiring appellant to dedicate a 75-foot half right-of-way for Speedway Boulevard; to dedicate a standard 25-foot radius spandrel at the corner of Speedway Boulevard and Silverbell Road; and to dedicate a 60-foot half right-of-way along that part of the property already zoned B–1, are invalid as an unlawful exercise of the police power and an attempt to secure private property without just compensation. Appellant has the right to have the property rezoned to B–1 free of these invalid conditions. The grant of a public privilege may not be conditioned upon the deprivation of constitutional protections. Scrutton v. County of Sacramento, supra.

The erroneous findings of the trial court are set aside and the judgment is reversed. The case is remanded to the trial court with instructions to enter judgment in favor of appellant and declare the rights of the parties in a manner consistent with this opinion.

KRUCKER, J., concurring.

HATHAWAY, Judge (dissenting).

In my view the evidence supports the trial court's conclusion that the conditions attached to the rezoning request were reasonable.

There is no doubt that a municipality may require, as a condition to its granting a rezoning application, dedication of a street. A.R.S. § 9–462.01(A)(7).[1]

The testimony disclosed that the shopping center contemplated on the property if rezoned would generate more traffic, being a more attractive development. The exhibits depicting the two plans in themselves seem to support the trial court's conclusions. The new Plan, S–1, opens the entire parking area to both Speedway and Silverbell, concentrates all traffic on the northside and as otherwise borne out in the evidence, presents a more attractive shopping center.

As observed in Scrutton v. County of Sacramento, cited by the majority, reasonable conditions may be imposed upon the landowner's proposal:

"A grant of public privilege may not be conditioned upon the deprivation of constitutional protections. (Bagley v. Washington Township Hosp. Dist., 65 Cal.2d 499, 504–505, 55 Cal.Rptr. 401, 421 P.2d 409; Danskin v. San Diego Unified Sch. Dist., 28 Cal.2d 536, 545–547, 171 P.2d 885.) The police power 'cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property.' [Citation omitted.]

"Although 'reasonableness' has been postulated as the hallmark of validity, a more precise standard is available. An utterance in Ayres v. City Council, supra, 34 Cal.2d at page 42, 207 P.2d at

---

1. That statute reads in part:
 "§ 9–462.01. Zoning regulations
 A. Pursuant to the provisions of this article, the legislative body of any municipality by ordinance may:
 * * * * *

7. Require as a condition of re-zoning public dedication of rights-of-way, as streets, alleys, public ways, drainage and public utilities as are reasonably required by or related to the effect of the re-zoning."

page 8 supplies it: '[W]here it is a condition reasonably related to increased traffic and other needs of the proposed [land use] it is voluntary in theory and not contrary to constitutional concepts.' The Ayres' formulation may be generalized by the statement that conditions imposed on the grant of land use applications are valid if reasonably conceived to fulfill public needs emanating from the landowner's proposed use." 79 Cal.Rptr. at 879.

Applying the Ayres' formulation, as generalized in *Scrutton,* it would appear that the conditions imposed upon the granting of rezoning are reasonably conceived to fulfill increased needs emanating from the landowner's proposed use. I would affirm.