949 P.2d 971

**GST TUCSON LIGHTWAVE, INC., an Arizona corporation, Plaintiff/Appellant,**

v.

**CITY OF TUCSON, a municipal corporation, Defendant/Appellee.**

**No. 2 CA–CV 96–0092.**

Court of Appeals of Arizona, Division 2, Department A.

Jan. 23, 1997.

Review Dismissed Aug. 22, 1997.

---

Belin Harris Lamson McCormick by Edward M. Mansfield, Des Moines, IA, and Nancy M. Coomer, Tucson, for Plaintiff/Appellant.

Gabroy, Rollman & Bossé, P.C. by Richard M. Rollman and Richard A. Brown, Tucson, for Defendant/Appellee.

## OPINION

PELANDER, Presiding Judge.

## I. FACTS AND PROCEDURAL BACKGROUND

Plaintiff GST Tucson Lightwave (Lightwave) provides telephone services in competition with local telephone companies. Generally, access to long distance carriers is provided by the local telephone company. Lightwave, a competitive access provider, uses fiberoptic cable to provide digital communications between a customer and a long distance carrier.

In July 1994, the City of Tucson granted Lightwave a 25–year non-exclusive license to install fiberoptic cable for the purpose of providing long distance telecommunication service and local linkage to long-distance telecommunications services in Tucson.[1] The license was amended in September 1994 to include an attached route map (designated as Exhibit 1 to the amended license) which the City's Mayor and Council had approved.

In June 1995, the City adopted Chapter 7B of the Tucson City Code, a comprehensive regulatory scheme pertaining to competitive access providers. Chapter 7B provides that companies may obtain licenses for long distance competitive access service and franchises for local service. The license/franchise under Chapter 7B differs from Lightwave's license in several respects. For example, Chapter 7B provides for a 15–year term, while Lightwave's license was for 25 years. A provider under Chapter 7B must pay the City a fee of 5½% of total gross revenues, while Lightwave's license fee was 2%. In addition, the City determined that long distance licenses and local franchises would not be granted separately under Chapter 7B. Rather, companies are required to apply for both a license for long distance service and a franchise for local service. Conditional proposals are not acceptable. The Chapter 7B license/franchise also gives providers equal access to power poles owned by Tucson Electric Power Company in City rights of way. Finally, the new license/franchise offers geographic flexibility by allowing companies to build their network throughout the city without seeking amendments from the Mayor and City Council.

Pursuant to § 7B–29, the City issued a Request for Proposals (RFP) to Lightwave and other companies. The RFP required

---

**1.** A.R.S. §§ 9–561 to 9–566 allow cities in Arizona to grant nonexclusive licenses to fiberoptic communications persons or entities for use of city rights of way for construction and operation of long distance telecommunications systems.

companies submitting proposals to apply for both a license for long distance competitive access service and a franchise for local service. In a June 26, 1995 letter to Lightwave, the City explained that if Lightwave obtained a new license and franchise under Chapter 7B, Lightwave's existing license "would be relinquished, and Tucson Lightwave would then be operating under the terms of the model license and the ordinance."

In response to the RFP, Lightwave submitted an application on certain "express conditions." Desiring to retain its license under the original terms and obtain a separate franchise for local service under Chapter 7B, Lightwave rejected the City's requirement that applicants apply for both a local franchise and a long-distance license. The City returned the application, explaining again that Lightwave had to apply for both a license and franchise under Chapter 7B and that once the license/franchise issued, Lightwave's existing license would be subsumed.

In late June 1995, Lightwave also sent a letter to the City Engineer requesting two modifications to its route map.[2] The City responded that modifications to the route required formal amendment approved by Mayor and Council, not just the City Engineer. The City further stated that if Lightwave sought to amend its license, City staff would recommend that the Mayor and Council "deny this request and instead require Lightwave to obtain a new license under Chapter 7B."

Lightwave filed this action in August 1995, seeking mandamus and special action relief as well as damages. In Count One, Lightwave asked the trial court to order the City Engineer to approve the route modifications requested in June. In Count Two, Lightwave sought an order requiring the City to process Lightwave's response to the RFP and deleting the "offending condition" requiring Lightwave to give up its existing license to obtain a franchise. Count Three sought damages pursuant to 42 U.S.C. § 1983 for the conduct described in Counts One and Two.

**2.** The first modification would have cut a corner to bypass a busy intersection; the second modification involved a more extensive deviation (ap-

The court held a three-day evidentiary hearing in September 1995. Counsel stipulated that the hearing would be the trial on the merits as to Counts One and Two and that no further evidence would be presented. The court subsequently issued findings of fact and conclusions of law and dismissed Counts One and Two with prejudice. The City then moved for summary judgment on Count Three, on the grounds that all the issues had already been decided in the City's favor. The court granted that motion and denied Lightwave's motion to amend its complaint. This appeal followed.

## II. DISCUSSION

■ When the trial court assumes jurisdiction of the merits in a special action proceeding, the court of appeals may review the determination of the merits. *Bilagody v. Thorneycroft,* 125 Ariz. 88, 92, 607 P.2d 965, 969 (App.1979). Review of the trial court's factual findings is deferential. *Federoff v. Pioneer Title & Trust Co.,* 166 Ariz. 383, 388, 803 P.2d 104, 109 (1990). "Our duty begins and ends with inquiring whether the trial court had before it evidence that might reasonably support its action when viewed in the light most favorable to sustaining the findings." *Id.* As for the trial court's conclusions of law, "this court is not bound by that finding and is free to draw its own legal conclusions from the evidence presented." *Ayala v. Hill,* 136 Ariz. 88, 90, 664 P.2d 238, 240 (App.1983).

### A. Count One

■ A franchise or license agreement between the City and its grantee is a contract. *City and Borough of Juneau v. Alaska Electric Light & Power Co.,* 622 P.2d 954, 955 n. 2 (Alaska 1981); *Alpert v. Boise Water Corp.,* 118 Idaho 136, 795 P.2d 298 (1990). Thus, we review the trial court's interpretation of the agreement *de novo. U.S. West Communications, Inc. v. Arizona Corporation Commission,* 185 Ariz. 277, 280, 915 P.2d 1232, 1235 (App.1996).

proximately one mile off the original route) to provide better access to the University of Arizona.

■ Section 3 of Lightwave's license defines its scope as extending to and including only those portions of streets, alleys, avenues and other public grounds as are designated in Exhibit 1 and the plans and specifications submitted to the City by Company on file with the City Clerk as of September 12, 1994, *or as subsequently may be approved by the City Engineer as necessary to carry out the purpose of this non-exclusive license.* (emphasis added). The trial court interpreted that section to authorize "the City Engineer to approve construction plans and specifications which may be subsequently submitted in order to carry out the purpose of the license," but found that it "does not authorize the City Engineer to change the route granted by Mayor and Council." We agree with that interpretation.

■ As the trial court noted, a license granted by a city for use of public rights of way is to be construed strictly in favor of the public.

Franchises granted by municipal corporations, being considered in derogation of the right of the public to free and unobstructed use of the streets, are strictly construed, and if the terms of the franchise are doubtful and susceptible of two or more constructions, they are to be construed strictly against the grantee and liberally in favor of the public. A franchise is not to be construed more strongly against the municipality than the public service company because it was prepared with care and leisure by the former, and accepted by the latter without like opportunity to consider its provisions. In case of doubt, a grant will be presumed to be for a public as distinguished from a private purpose.

12 McQuillin, The Law of Municipal Corporations § 34.45 at 148 (3d ed.1995).[3] "Nothing passes by grant unless it is clearly stated or necessarily implied." *Id. See also Knoxville Water Co. v. City of Knoxville*, 200 U.S. 22, 26 S.Ct. 224, 50 L.Ed. 353 (1906); *City of Tucson v. Polar Water Co.*, 76 Ariz. 126, 259 P.2d 561 (1953), *modified on other grounds*, 76 Ariz. 404, 265 P.2d 773 (1954); *City of*

*Richmond v. Chesapeake and Potomac Tel. Co. of Virginia*, 205 Va. 919, 923, 140 S.E.2d 683, 686 (1965).

In light of this principle, we cannot construe section 3 of Lightwave's license to permit, let alone require, the City Engineer to modify the license by approving expansion or alteration of the route map without resort to the formal amendment process and approval by the Mayor and City Council. Rather, the phrase "or as subsequently may be approved by the City Engineer as necessary to carry out the purpose of this non-exclusive license" in section 3 refers to the "plans and specifications submitted to the City by [Lightwave] on file with the City Clerk."

Lightwave's arguments for a contrary interpretation are not persuasive. First, Lightwave asserts that Exhibit 4 to the license, which describes services the City receives from Lightwave, requires Lightwave to serve City buildings that are not on Lightwave's route. Therefore, it argues, there is an "irreconcilable conflict" in the trial court's interpretation of the license. Exhibit 4 requires Lightwave to provide the City with "an Indefeasible Right of Use ... for six (6) dark fibers *in any route of TLI's network as provided below* for the City's use." (emphasis added). The fibers are to be provided "along any route constructed within the City of Tucson to connect the Tier 1 and Tier 2 buildings listed below." Exhibit 4 then describes "the following Tier 1 and Tier 2 buildings which are adjacent or readily connectible to the routes to be constructed by TLI" and lists 29 buildings. Exhibit 4 further provides that the City "has identified additional Tier 3 buildings" and that Lightwave "will provide the City an access to all such buildings *which adjoin [its] network.*" (emphasis added).

There is no dispute that some of the buildings listed in Exhibit 4 are not located on Lightwave's route map. However, this does not pose an irreconcilable conflict with the trial court's interpretation of the license. At trial, the City's witnesses testified that Exhibit 4 simply required Lightwave to serve

---

**3.** Lightwave argues that this rule of construction applies only "to exclusive franchises and not licenses." However, McQuillin uses both terms to refer to a city's grant "to companies, individuals or partnerships to use the streets." 12 McQuillin § 34.01 at 7.

those particular buildings once its route became adjacent to them. There is ample support in the record for the conclusion that Exhibit 4 does not contradict the City's interpretation of the license.

Second, Lightwave's argument that the trial court's interpretation renders the license "unworkable" is not supported by the record and overlooks the fact that the limited scope of its license is expressly defined by the route map attached as an exhibit thereto. Aside from section 3, section 1 of the license granted Lightwave use of "public rights-of-way ... as shown on the map, designated on Exhibit 1 attached hereto." Similarly, section 2 of the license limited Lightwave's privileged use of public property to that "set forth in Exhibit 1."

Finally, Lightwave relies on "the extrinsic circumstances—conversations and correspondence between the parties" to support its interpretation of section 3. Although Lightwave presented evidence that during the negotiations on the amended September 1994 license, City officials orally assured Lightwave that the route map could be modified over time and that the City Engineer had authority to authorize such changes, the City's witnesses denied making such statements. The trial court resolved the evidentiary conflict in the City's favor, finding that "[n]o officer or employee of the City has told any officer or employee of Lightwave that the City Engineer is authorized to approve changes to the route plan granted to Lightwave in its License." Because those findings are supported by the record and are not clearly erroneous, we will not disturb them on appeal.[4] For the foregoing reasons, the trial court did not err in dismissing Count One.

B. *Count Two*

As originally enacted, Chapter 7B did not expressly require that applicants apply for both a license for long distance service and a franchise for local service. However, the

RFP and the attached model license agreement indicated that the City would grant only a combined license/franchise. Moreover, the City subsequently amended § 7B(29)(7) to provide that

> Application for a license or franchise pursuant to this Chapter constitutes a consent by the applicant to the surrendering of any and all pre-existing licenses or franchises for the provision of any aspect of competitive telecommunications services previously granted by the City of Tucson. Upon the granting of a license or franchise pursuant to this Chapter, the applicant shall forthwith surrender any and all such existing licenses or franchises to the City, and any and all such licenses or franchises shall be superseded by the license or franchise granted pursuant to this Chapter.

In Count Two of its complaint, Lightwave claimed the City's requirement that Lightwave relinquish its existing license in order to obtain a franchise for local telecommunications service under Chapter 7B of the Tucson City Code was an invalid condition. The trial court concluded that the Mayor and City Council "exercised reasonable legislative discretion in directing that the request for proposals under chapter 7B–29 shall permit only proposals for licenses and conditional franchises, and not for franchises only." The court further found that the Mayor and City Council "acted reasonably in requiring licensees to surrender prior licenses upon obtaining a new license under chapter 7B" and that the requirement "is reasonably related to the interests of the City that businesses compete on an equal basis."

Relying primarily on two Supreme Court cases, *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), Lightwave contends that conditioning the ability to obtain a local franchise on the surrender of its existing

4. Lightwave suggests that for purposes of interpreting the pertinent language, "[a] more important question is what the parties intended," citing *Taylor v. State Farm Mut. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134 (1993). However, Lightwave disregards the fact that the trial court heard evidence and issued findings of fact determining that the parties did not intend that the City Engineer have authority to modify the route.

license, for which it had invested over $3 million, creates an "unconstitutional condition." "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right ... in exchange for a discretionary benefit conferred by the government." *Dolan,* 512 U.S. at 384, 114 S.Ct. at 2316. Although Lightwave does not specify the constitutional bases for its argument, presumably it relies on the Fifth Amendment's prohibition against private property being taken for public use without just compensation and the Fourteenth Amendment's prohibition against a state depriving any person of property without due process of law.

In *Nollan,* the California Coastal Commission conditioned grant of a coastal development permit on a landowner's dedication of land for a public easement for access to the beach. The Supreme Court first found that requiring uncompensated conveyance of an easement outright would clearly be a taking. 483 U.S. at 834–35, 107 S.Ct. at 3146–47. Because land-use regulation does not constitute a taking if it substantially advances legitimate state interests, however, the court indicated that imposition of such a condition would be constitutional if there were an "essential nexus" between a legitimate state interest and the condition imposed by the government on obtaining a permit. 483 U.S. at 837, 107 S.Ct. at 3148. In *Nollan,* there was no nexus between the asserted interest—protecting visual access to the ocean—and a condition that required public access along a private beachfront lot. *Id.*

■ In *Dolan,* a small business owner applied for a city permit to enlarge her store and expand a paved parking area. The city conditioned the permit on her dedication of two portions of land for a greenway and a pedestrian and bicycle path. Initially, the Court found that there was an "essential nexus" between the city's legitimate interest in flood control and traffic control and the anticipated effects of the development. 512 U.S. at 387, 114 S.Ct. at 2318. The Court

then expanded the *Nollan* test, requiring that there be a reasonable relationship between the conditions imposed and the projected effects of the land development. 512 U.S. at 390, 114 S.Ct. at 2319. The Court used the term "rough proportionality" to describe the requirement. "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." 512 U.S. at 390, 114 S.Ct. at 2320.[5]

In our view, resolution of Count Two does not turn on application of the "essential nexus" or "rough proportionality" tests established in *Nollan* and *Dolan.* That the City and Chapter 7B prohibited conditional responses to the RFP and required applicants for a license/franchise under Chapter 7B to surrender any preexisting license previously granted by the City does not amount to an unconstitutional taking. As the City correctly notes, unlike *Nollan* and *Dolan,* this case does not involve the City forcing Lightwave "to dedicate a portion of its private property to public use," but rather "involves the use of **public property** for private profit." Nor does the case involve outright revocation or suspension of Lightwave's license, which it could retain and continue operating under if it chose.

■ "[I]n order for [the plaintiff] to establish that an unconstitutional condition was demanded, the City's condition must amount to a taking of property without due process of law." *Parks v. Watson,* 716 F.2d 646, 651 (9th Cir.1983). We have neither been cited to nor found any cases addressing whether and/or how the Takings Clause applies when the protected property right at issue is a franchise or license issued by a municipality to use public rights-of-way. In the absence of any such authority, we question whether the *Nollan/Dolan* analysis applies to this situation at all.

---

5. In *Transamerica Title Ins. Co. v. City of Tucson,* 23 Ariz.App. 385, 533 P.2d 693 (1975), which predated both *Nollan* and *Dolan,* this court held that a city could not require a landowner to dedicate part of his land for a right-of-way as a condition of rezoning, because there was an insufficient relationship between the conditions and the proposed use of the land. *Id.* at 390, 533 P.2d at 698.

Indeed, courts and commentators have suggested that this particular analysis is "limited to the context of development exactions where there is a physical taking or its equivalent." *Clajon Production Corp. v. Petera,* 70 F.3d 1566, 1578 (10th Cir.1995). *See also Harris v. City of Wichita,* 862 F.Supp. 287, 294 (D.Kan.1994), *aff'd,* 74 F.3d 1249 (10th Cir.1996); Christopher J. St. Jeanos, *Note, Dolan v. Tigard and the Rough Proportionality Test: Roughly Speaking, Why Isn't a Nexus Enough?,* 63 Fordham L.Rev. 1883, 1886 (1995). As the Tenth Circuit has noted, "both *Nollan* and *Dolan* follow from takings jurisprudence's traditional concern that an individual cannot be forced to dedicate his or her land to a public use without just compensation." 70 F.3d at 1578. The cases "are best understood as extending the analysis of complete physical occupation cases to those situations in which the government achieves the same end (i.e. the possession of one's physical property) through a conditional permitting procedure." *Id.*

In addition, our supreme court has recently stated that *Dolan* applies to "a city's *adjudicative* decision to impose a condition tailored to the particular circumstances of an individual case" but not to "a generally applicable *legislative* decision by the city." *Home Builders Ass'n of Central Arizona v. City of Scottsdale,* 187 Ariz. 479, 485, 930 P.2d 993, 999 (Ariz.1997) (emphasis in original). As Division One of this court noted in the *Home Builders* case, the concern in *Dolan* was "with arbitrary, non-legislative conditions being placed upon landowners" and "is implicated when an administrator or commission exacts conditions from individual property-owners with little or no legislative guidance." *Home Builders Ass'n of Central Arizona v. City of Scottsdale,* 183 Ariz. 243, 248, 902 P.2d 1347, 1352 (App.1995), *app'd in part,* 187 Ariz. 479, 930 P.2d 993 (Ariz.1997). In this case, as in the *Home Builders* case, that concern is not present since "the legislature, after undertaking sufficient analysis, has determined a policy and then mandated uniform and specific means of accomplishing that policy...." *Home Builders,* 183 Ariz. at 248, 902 P.2d at 1352.

Even if the *Nollan/Dolan* requirements were pertinent in this context, where the City imposed a condition applicable to all RFP applicants under Chapter 7B, we believe they were met. The City's desire for competition among telecommunications providers in Tucson, fair and adequate compensation for the private use of public property, and providers' commitment to both long distance and local services are important public interests underlying Chapter 7B and the City's actions. There is an "essential nexus" between those legitimate public interests and the challenged condition imposed by the City; and that condition was "roughly proportional," or reasonably related, to the adverse impact Lightwave's proposed development (use of city rights of way for local service and long distance services, at a competitive advantage over other providers) would have had. In sum, the evidence supported the trial court's determinations that Chapter 7B's requirements were "intended to provide a 'level playing field' for all licensees operating under chapter 7B," the City "has a reasonable interest in encouraging competition on equal terms among businesses located within the City," and the Mayor and City Council "exercised reasonable legislative discretion in adopting chapter 7B ... for the purpose of encouraging competition and regulating the delivery of telecommunication services within the City."

As the City correctly suggests, the Constitution does not require a city to grant valuable rights to operate a private business in city rights-of-way without conditioning such grant on adequate compensation to the public and equal treatment among telecommunications providers. "Courts must accord municipalities considerable deference and upset their legislative decisions only if they are shown to be arbitrary and without factual justification." *Home Builders,* 187 Ariz. at 483, 930 P.2d at 997. For the foregoing reasons, we cannot conclude that the City's requirement that Lightwave surrender its existing license in order to obtain a new license/franchise under Chapter 7B was an unconstitutional condition. Therefore, the trial court did not err in dismissing Count Two. Similarly, because Lightwave's dam-

age claim in Count Three was based on the conduct alleged in Counts One and Two, the trial court properly granted summary judgment for the City on Count Three.

### C. *Motion to Amend Complaint*

After the trial court dismissed Counts One and Two, Lightwave moved to amend its complaint to add Count Four. Lightwave contended that since the evidentiary hearing, the City had claimed that all new customer connections using rights of way not shown on the route map had to be formally approved by the Mayor and City Council. Lightwave asked the court to order the City Engineer to issue permits for the requested new customer connections and contended that the court's ruling on Count One did not preclude the new claim. The trial court denied the motion. Having properly concluded that the City Engineer lacked authority to approve expansion of Lightwave's use of rights of way beyond those specified on the route map, the trial court did not abuse its discretion in denying leave to add a similar new claim and implicitly concluding that such an amendment would be futile. *See Walls v. Arizona Dept. of Public Safety,* 170 Ariz. 591, 597, 826 P.2d 1217, 1223 (App.1991).

## III. CONCLUSION

Affirmed.

DRUKE, C.J., and LIVERMORE, J., concur.