70 F.3d 1566
 64 USLW 2341, 26 Envtl. L. Rep. 20,213
 CLAJON PRODUCTION CORPORATION; Marion H. Scott, Mary C.
Scott, husband and wife; and Salt Creek Ranch,
L.L.C., a Wyoming limited liability
corporation, Plaintiffs-Appellants,
v.
Pete E. PETERA, Director of the Wyoming Game and Fish
Department, in his personal capacity; Jay Lawson, Chief
Game Warden of the Wyoming Game and Fish Department, in his
personal capacity; the Wyoming Game and Fish Commission;
Dan Kennedy, Kevin Dooley, Mike Hunzie, Hal Corbett, Mary
Flitner, Kari Priewe, and David Steger, members of the
Wyoming Game and Fish Commission, in their personal
capacities, Defendants-Appellees,
National Wildlife Federation; Wyoming Wildlife Federation;
Phyllis Achison; Taylor Outfitters; Wyoming Outdoor
Council; Dubois Wildlife Association; Heart Mountain
Wildlife Association; Greater Yellowstone Coalition;
Medicine Butte Wildlife Association; Wyoming Chapter of the
Sierra Club; and Orion, The Hunters Institute,
Intervenors-Appellees.
CLAJON PRODUCTION CORPORATION; Marion H. Scott, Mary C.
Scott, husband and wife; and Salt Creek Ranch,
L.L.C., a Wyoming limited liability
corporation, Plaintiffs-Appellees,
v.
Pete E. PETERA, Director of the Wyoming Game and Fish
Department, in his personal capacity; Jay Lawson, Chief
Game Warden of the Wyoming Game and Fish Department, in his
personal capacity; the Wyoming Game and Fish Commission;
Dan Kennedy, Kevin Dooley, Mike Hunzie, Hal Corbett, Mary
Flitner, Kari Priewe, and David Steger, members of the
Wyoming Game and Fish Commission, in their personal
capacities, Defendants,
National Wildlife Federation; Wyoming Wildlife Federation;
Phyllis Achison; Taylor Outfitters; Wyoming Outdoor
Council; Dubois Wildlife Association; Heart Mountain
Wildlife Association; Greater Yellowstone Coalition;
Medicine Butte Wildlife Association; Wyoming Chapter of the
Sierra Club; and Orion, The Hunters Institute,
Intervenors-Appellants.
 Nos. 94-8071, 94-8103.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 20, 1995.
 
 James R. Scarantino, Albuquerque, New Mexico (John MacPherson of MacPherson Law Offices, Rawlins, Wyoming, Karen J. Budd-Falen of Budd-Falen, Cheyenne, Wyoming, with him on the briefs), for plaintiffs-appellants-appellees.
 Ron Arnold of the Office of the Attorney General, State of Wyoming, Cheyenne, Wyoming (Joseph B. Meyer, Mary B. Guthrie and Kristi Sansonetti, of the Office of the Attorney General, State of Wyoming, Cheyenne, Wyoming, with him on the brief), for defendants-appellees.
 Susan Morath Horner of Boulder, Colorado (James J. Tuchton of the National Wildlife Federation, University of Colorado, Boulder, Colorado, and Thomas David Lustig of Boulder, Colorado, with her on the brief), for intervenors-appellees-appellants.
 Before BALDOCK, ALARCON,* and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This case is a 42 U.S.C. Sec. 1983 action challenging several Wyoming hunting regulations as violative of the federal and state constitutional rights of a number of Wyoming ranchers ("Plaintiffs") who offer hunting services to out-of-state residents. Plaintiffs commenced this action for declaratory and injunctive relief against the Wyoming officials who promulgated the challenged regulations and who are charged with administering them ("State Defendants"),[1] and the National Wildlife Fund and several environmental groups ("Intervenors") intervened in the case as codefendants (collectively "Defendants"). After both parties moved for summary judgment, the district court denied Plaintiffs' motion for partial summary judgment, granted Defendants' motion for summary judgment on all of Plaintiffs' federal constitutional claims and declined to exercise supplemental jurisdiction over the state constitutional claims. See Clajon v. Petera, 854 F.Supp. 843 (D.Wyo.1994). The district court subsequently refused to grant Intervenors' request for attorneys' fees. See Clajon v. Petera, No. 93-CIV-0223-B (D.Wyo. Nov. 7, 1994). Plaintiffs appealed the district court's disposition of their federal constitutional claims, and Intervenors appealed the district court's denial of their application for attorneys' fees. We exercise jurisdiction over these consolidated appeals under 28 U.S.C. Sec. 1291.[2]
 
 
 2
 In this appeal, Plaintiffs complain that (1) Wyoming's restriction on the availability of hunting licenses to out-of-state residents violates the Commerce Clause; and (2) Wyoming's two-license limit on supplemental hunting licenses issued to large landowners violates the Takings and Equal Protection Clauses.[3] For the reasons stated below, we DISMISS Plaintiffs' Commerce Clause claim for lack of standing and we otherwise AFFIRM the district court's grant of summary judgment to Defendants and its denial of Plaintiffs' motion for partial summary judgment. Furthermore, we AFFIRM the district court's judgment that Intervenors are not entitled to attorneys' fees as a "prevailing party" under 42 U.S.C. Sec. 1988.
 
 BACKGROUND
 
 3
 Over fifty years ago, the State of Wyoming enacted a comprehensive statutory scheme to regulate hunting and fishing. See Wyo.Stat. Secs. 23-1-101 to 901 (1991). This statutory scheme aspired to "provide an adequate and flexible system for control, propagation, management, protection and regulation of all Wyoming wildlife." Id. Sec. 23-1-103; see also O'Brien v. State, 711 P.2d 1144, 1148 (Wyo.1986) (same). To implement this goal, the Wyoming legislature established a Game and Fish Commission ("the Commission"), Wyo.Stat. Sec. 23-1-201 (1991), and granted it "extensive powers and duties," O'Brien, 711 P.2d at 1149; Wyo.Stat. Sec. 23-1-302 (Supp.1994). These powers include the authority (1) to promulgate regulations governing hunting and fishing; as well as (2) to direct the Game and Fish Department. See Wyo.Stat. Sec. 23-1-302; Sec. 23-1-401.
 
 
 4
 Pursuant to this broad mandate, the Commission annually determines the types of species available for hunting and the overall number of animals of each species that may be taken.[4] The Commission first sets the number of licenses that can be issued in "limited quota areas"[5] and then determines whether the number of applications for licenses exceeds the number of available licenses. If so, a random computer lottery assigns the licenses. See Clajon, 854 F.Supp. at 848-49.
 
 
 5
 To effectuate this system of allocating hunting licenses, the Commission promulgated a set of regulations entitled "Chapter XLIV: Regulation for Issuance of Licenses." In addition to outlining the criteria for licenses, these regulations specifically provide that landowners of 160 or more acres are granted two supplemental licenses in recognition of their land's support of wild animals, see Chapter XLIV Sec. 3 ("Section 3"),[6] and it allocates between residents and nonresidents the percentage of hunting licenses that each may receive through the lottery system, see id. at Secs. 5-6 ("Sections 5 and 6").[7]
 
 
 6
 Plaintiffs commenced this action to challenge Sections 3, 5 and 6 of the regulations contained in Chapter XLIV. Specifically, Plaintiffs contended that (1) Sections 5 and 6's restriction on the percentage of licenses that can be issued to nonresidents unconstitutionally discriminates against interstate commerce; and (2) Section 3's two-license limit for large landowners[8] no matter how large the landholdings effects an unconstitutional taking and violates the Equal Protection Clause. The district court rejected Plaintiffs' claims, granted Defendants' motion for summary judgment on all of the federal constitutional claims, and denied Plaintiffs' motion for partial summary judgment on the Commerce Clause claim. Plaintiffs now appeal.
 
 DISCUSSION
 
 7
 We review the district court's summary judgment rulings de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). That is, we first consider if there is a genuine issue of material fact in dispute; if not, we then determine if the district court correctly applied the substantive law. Applied Genetics, 912 F.2d at 1241.
 
 
 8
 In so doing, we hold in Part A that Plaintiffs lack standing to challenge the nonresident hunting license allocation scheme because they have failed to demonstrate any injury-in-fact arising from the allocation scheme. We therefore dismiss that claim. In Parts B and C, we AFFIRM the district court's grant of Defendants' motion for summary judgment on Plaintiffs' Takings and Equal Protection Clause claims. Finally, in Part D, we AFFIRM the district court's ruling that Intervenors are not entitled to an award of attorney's fees.[9]
 
 A. COMMERCE CLAUSE CHALLENGE
 
 9
 We first address Plaintiffs' argument that Sections 5 and 6--the regulations allocating the percentage of hunting licenses between residents and nonresidents--violate the Commerce Clause.[10] However, because Plaintiffs have not established that the regulations interfere with their ability to provide commercial hunting services to out-of-state residents, Plaintiffs have not established injury-in-fact and thus lack standing to challenge the regulations under the Commerce Clause.[11]
 
 
 10
 The requirement that a litigant have "standing" to invoke the power of a federal court is perhaps the most important of the Article III justiciability doctrines. Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1983). The constitutional minimum of standing contains three elements. First, a plaintiff must have suffered an "injury-in-fact." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Second, the injury must be "fairly traceable to the defendant's allegedly unlawful conduct." Allen, 468 U.S. at 751, 104 S.Ct. at 3324. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " Lujan, 504 U.S. at 561, 112 S.Ct. at 2136 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 43, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976)). The party invoking the jurisdiction of the court bears the burden of establishing these elements. Lujan, 504 U.S. at 561, 112 S.Ct. at 2136; see also Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1485 (10th Cir.1995).
 
 
 11
 The injury-in-fact element requires that the plaintiff have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.' " Lujan, 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted). At the summary judgment stage, the injury-in-fact element requires that the plaintiff set forth by affidavit or other evidence specific facts which for purposes of the summary judgment will be taken to be true. Lujan, 504 U.S. at 561, 112 S.Ct. at 2136 (citing Fed.R.Civ.P. 56(e)); see also Lucas v. South Carolina Coastal Council, 505 U.S. 1003, ---- - ---- n. 3, 112 S.Ct. 2886, 2891-92 n. 3, 120 L.Ed.2d 798 ("[I]njury-in-fact at the summary judgment stage require[s] specific facts to be adduced by sworn testimony.") (emphasis in original). Thus, in order to withstand Defendants' motion for summary judgment, Plaintiffs must at a minimum set forth specific facts from which we could conclude that the Wyoming hunting license allocation scheme causes them some judicially cognizable injury. Lujan, 504 U.S. at 561, 112 S.Ct. at 2136. This Plaintiffs have failed to do.
 
 
 12
 We first note that Plaintiffs do not allege injury-in-fact from Wyoming's decision to limit the total availability of hunting licenses. There is no dispute that a state has the authority under its police power to limit evenhandedly the overall number of available hunting licenses. See Hughes v. Oklahoma, 441 U.S. 322, 337-38, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979) (because of the state's interest in conservation, it may regulate wild animals evenhandedly under the police power); see also Baldwin v. Montana Fish and Game Comm'n, 436 U.S. 371, 377, 388, 98 S.Ct. 1852, 1857, 1862, 56 L.Ed.2d 354 (1978). As a result, Plaintiffs must instead trace their alleged injury to what they perceive to be an unequal allocation of wild game licenses between resident and nonresident hunters.
 
 
 13
 Plaintiffs' specific claim of injury is that the license allocation scheme denies them the ability to transact business with potential nonresident purchasers of their outfitting services. Their complaint alleges that:
 
 
 14
 Nonresidents whom Plaintiffs have invited to hunt on their lands have been unsuccessful in drawing a license, and consequently, as the result of Defendants' laws and regulations, Plaintiffs have been prohibited from granting hunting opportunities on their lands to nonresidents of their own choosing.
 
 
 15
 Aplt.App. at 9. Plaintiffs also assert that nonresident hunters spend disproportionately greater amounts on commercial hunting services and hunting rights than do Wyoming residents. Accordingly, Plaintiffs argue, the license allocation scheme causes them injury-in-fact by denying them access to a profitable pool of nonresident customers.
 
 
 16
 Admittedly, the loss of an opportunity for an economic benefit may constitute a cognizable injury. See Northeastern Florida Contractors v. Jacksonville, --- U.S. ----, ---- - ----, 113 S.Ct. 2297, 2302-03, 124 L.Ed.2d 586 (1993) (denial of opportunity to compete for a public construction contract constitutes injury-in-fact); cf. Regents of Univ. of California v. Bakke, 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (requisite injury occurred when the school did not "permit Bakke to compete for all 100 places in the class, simply because of his race.") (emphasis in original). However, standing requires more than simply an injury to a cognizable interest; it also requires that the injury suffered by the plaintiff be fairly traceable to the defendant's allegedly unlawful conduct. Allen v. Wright, 468 U.S. 737, 757, 104 S.Ct. 3315, 3327, 82 L.Ed.2d 556 (1984). Thus, in order to establish standing, Plaintiffs must show a causal nexus between the license allocation scheme and their inability to attract nonresident hunting customers. See Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) (plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions").
 
 
 17
 In this regard, Plaintiffs contend that the affidavits from ranchers and a study from the University of Wyoming demonstrate that the residency-based licensing system impairs Plaintiffs' ability to sell their commercial hunting services in the potentially lucrative out-of-state market. It is clear that the rancher affidavits and the University of Wyoming study both attest to the fact that nonresidents spend more than residents both for the use of hunting services and for the right to hunt on Plaintiffs' land. See, e.g., Scott Aff. p 12-13, Aplt.App. at 313; Univ. of Wyo. Study at 4, Aplt.App. at 322 (concluding that "the net gain to the state's economy is greater for outfitted nonresident elk hunters"); id. at 331 ("outfitters predominantly sell their services to nonresidents").[12] However, even if nonresidents spend more money than residents, Plaintiffs are required to present some evidence that the license allocation scheme between residents and nonresidents is causing fewer nonresidents to hunt in Wyoming. In other words, Plaintiffs must demonstrate that Wyoming's allocation between in-state and out-of-state licenses disproportionately disadvantages nonresidents by failing adequately to approximate the ratio of demand between in-state and out-of-state hunters.
 
 
 18
 No one disputes that Wyoming can limit total hunting licenses as a legitimate response to the need to manage and conserve wildlife in the state. Yet instead of putting all applications (both in-state and out-of-state applicants) into a single pool from which the licenses are drawn, Wyoming has chosen to utilize two separate pools in those areas where Plaintiffs' land is located, with 80% of the deer, antelope, mountain lion and wild turkey licenses and 84% of the elk licenses reserved for residents and the remaining 20% and 16% of such licenses reserved for out-of-state applicants. A necessary premise of Plaintiffs' argument that this license allocation scheme causes them injury-in-fact is that the nonresidents who are subject to their own separate lottery would fare better if they simply competed for the permits through a general lottery which included all applications for hunting permits; however, there is no proof of this premise. While the rancher affidavits offer conclusory allegations that Wyoming's hunting licensing scheme deters some nonresidents from entering Wyoming to engage in hunting, it is the inevitable nature of any permitting scheme when demand outstrips supply that some applicants will be deterred regardless of their state of residence. We have not found any evidence that the regulations impose a greater burden on nonresidents wishing to hunt in Wyoming than they do upon residents. Therefore, because neither the report nor the affidavits contain any evidence about the relative demand--that is, the demand for resident hunting licenses in the limited quota areas in relation to the nonresident demand--Plaintiffs have failed to establish any injury that is "fairly traceable" to the license allocation scheme. See Allen, 468 U.S. at 757-58, 104 S.Ct. at 3327-28; Simon, 426 U.S. at 45, 96 S.Ct. at 1927.[13]
 
 
 19
 The district court determined that the Plaintiffs failed to show a violation of the Commerce Clause because there was no indication of the nature or extent to which the allocation provisions burdened Plaintiffs' ability to provide hunting services to nonresidents in interstate commerce. See Clajon, 854 F.Supp. at 862. However, because this same failure of proof also means that Plaintiffs have failed to demonstrate any injury-in-fact flowing from Wyoming's method of allocating licenses between residents and nonresidents, we conclude that Plaintiffs have failed to demonstrate standing to assert their Commerce Clause challenge to this aspect of Wyoming's licensing plan. Thus, we dismiss that claim for lack of jurisdiction.[14]
 
 B. TAKINGS CLAUSE CLAIM
 
 20
 Plaintiffs argue that Section 3 violates the Fifth Amendment's prohibition against taking property without just compensation by allocating landowners no more than two licenses per species of elk, deer or antelope regardless of how many animals reproduced on the landowner's property.[15] Although we first have to address ripeness and the issue of whether there exists a constitutionally protected property right to hunt surplus wild game on one's land, we ultimately conclude that Section 3 does not constitute an unconstitutional taking because the regulation neither deprives Plaintiffs of all economically beneficial use of their land nor fails substantially to advance a legitimate state interest.
 
 1. Jurisdiction
 
 21
 Intervenors initially contend that Plaintiffs' Takings and Equal Protection Clause claims are not ripe for consideration because Plaintiffs failed first to seek compensation in state court. We agree that if the Commission enjoyed the power to condemn land, see Wyo.Stat. Sec. 1-26-501(b) (1988) (limiting the power of condemnation to those expressly authorized by statute), then the Commission could be sued under Wyoming's inverse condemnation statute for just compensation, see id. Sec. 1-26-516 ("When a person possessing power of condemnation takes possession of or damages land," the owner can file an action for damages). Moreover, if Wyoming's inverse condemnation procedure were available to Plaintiffs, this action would not be ripe for consideration, and thus, we would lack jurisdiction over Plaintiffs' Takings Clause claim. See Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194-197, 105 S.Ct. 3108, 3120-22, 87 L.Ed.2d 126 (1985) (explaining that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation"); Miller v. Campbell County, 945 F.2d 348, 352 (10th Cir.1991) (failure to invoke Wyoming inverse condemnation procedure before seeking federal court relief renders case unripe for consideration), cert. denied, 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992). However, because the Commission lacks the power of eminent domain, see Sec. 23-1-302(a)(iii) (Commission empowered to "acquire lands in the name of Wyoming by purchase, lease, agreement, gift or devise, not including powers of eminent domain ") (emphasis added), and thus, is not subject to Wyoming's inverse condemnation procedure, Plaintiffs' takings claim is ripe for review.
 
 2. The Right To Hunt
 
 22
 At common law, a landowner traditionally had the right to hunt wild animals on his or her land. In fact, the commitment to this property right was so ingrained at common law that when the King, following the Norman Conquest, attempted to limit this right, the landowners, "vehemently objecting, quickly and decisively recaptured their rights and re-established the common law." Alford v. Finch, 155 So.2d 790, 792 (Fla.1963) (citing 2 Blackstone, Commentaries 415). However, even in those states that recognize a property right to hunt on one's land, there is often a recognition that the state enjoys (and enjoyed at common law) the police power reasonably to regulate and control the hunting of game for the beneficial use of the entire state. See Harper v. Galloway, 58 Fla. 255, 51 So. 226, 228 (1910). Indeed, Plaintiffs here recognize the right of the state reasonably to limit hunting. See Aplt's Br. at 31 n. 4. However, Plaintiffs contend that any effort by the state to limit their right to hunt the "harvestable surplus" from their land--i.e., the excess animals available for hunting which were produced on their land--constitutes an unconstitutional taking.
 
 
 23
 While Wyoming appears to adhere to the common law view that a landowner may exclude others from hunting or fishing on the landowner's property, see Day v. Armstrong, 362 P.2d 137, 151 (Wyo.1961) ("the State is without power to authorize" the public to fish or hunt on private lands except as incident to the full exercise of the easement of using navigable or non-navigable waters),[16] it has not explicitly addressed the issue of whether a landowner has a property right to hunt surplus game that may be found on his or her land, nor has it opined on the extent of that right in light of game conservation regulations. Ordinarily, we would first address the extent of the Plaintiffs' property right before determining whether there has been an unconstitutional infringement of that right, Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909) (directing courts first to determine issues of state law before deciding constitutional questions), and where the threshold state law issue is uncertain and a state court's clarification would make our constitutional ruling unnecessary, we would ordinarily abstain from deciding the case, Railroad Comm'n v. Pullman Co., 312 U.S. 496, 500-01, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Here, however, we assume without deciding that the Plaintiffs have at least a limited property interest to hunt surplus game on their land that is impacted by the regulations in question. There are several factors that cause us to address the constitutional issue directly while assuming that the Plaintiffs possess an underlying property right. First, we ultimately conclude that Wyoming's restrictions are constitutional and Pullman abstention is less appropriate when the assumed state law is upheld as constitutional. See Telephone News Sys., Inc. v. Illinois Bell Tel. Co., 220 F.Supp. 621, 637 (N.D.Ill.1963) (abstention less appropriate where the state law at issue judged to be constitutional), aff'd, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964) (per curiam). Second, Plaintiffs' property rights, for purposes of the Takings Clause, may not totally be left to the mercies of the state, see Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and the weight of the common law suggests that the property right assumption that we make is not an unreasonable one. Third, this approach enables us to avoid opining on an unclear and difficult issue that has substantial underpinnings in state law. See generally Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Fourth, Wyoming has not argued in favor of abstention and the parties have not briefed the Pullman abstention issue. See City of Houston v. Hill, 482 U.S. 451, 467 n. 16, 107 S.Ct. 2502, 2512 n. 16, 96 L.Ed.2d 398 (1987). Fifth, the delay engendered by declining to consider the merits of Plaintiffs' constitutional challenge at this time also militates against abstention. See Anderson v. Babb, 632 F.2d 300, 306 n. 3 (4th Cir.1980). Finally, we note that courts must exercise caution before abstaining from considering the merits of constitutional claims brought under section 1983. See Tovar v. Billmeyer, 609 F.2d 1291, 1293 (9th Cir.1979) (" 'unflagging obligation' " to exercise federal jurisdiction is "particularly weighty when those seeking a hearing in federal court are asserting ... their right to relief under 42 U.S.C. Sec. 1983") (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-18, 96 S.Ct. 1236, 1246-47, 47 L.Ed.2d 483 (1976)). Thus, we proceed to consider whether the regulation at issue effects an unconstitutional taking.
 
 3. Takings Inquiry
 
 24
 Based on Plaintiffs' view that they enjoy a common law property right to hunt surplus game on their land, Plaintiffs claim that Section 3 constitutes an inappropriate "leveraging of the police power," Nollan v. California Coastal Comm'n, 483 U.S. 825, 837 n. 5, 107 S.Ct. 3141, 3149 n. 5, 97 L.Ed.2d 677 (1987), to take away their property right to hunt and to circumvent the Takings Clause's just compensation requirement. That is, Plaintiffs contend that Wyoming law requires them to forego the use of an important "stick[ ] in the bundle of rights that are commonly characterized as property," Dolan v. City of Tigard, --- U.S. ----, ----, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994) (quotation omitted)--i.e., the right to hunt on their land. Thus, Plaintiffs conclude, Wyoming must justly compensate them.
 
 
 25
 Plaintiffs resist framing their argument as a "regulatory" takings claim (as opposed to a physical occupation). However, because they do not complain of a physical occupation, they must rely on the claim that if a "regulation goes too far [then] it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). A regulation "goes too far" so as to effect a regulatory taking if (1) it deprives an individual of all economically beneficial use of his or her property; or (2) it does not substantially advance legitimate state interests. Dolan, --- U.S. at ----, 114 S.Ct. at 2316 (quoting Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798 (1992) (same).
 
 
 26
 a. The "Economically Beneficial Use" Test
 
 
 27
 If a regulation prohibits all "economically beneficial use," then that regulation categorically effects a taking in the same sense as a physical occupation. Lucas, 505 U.S. at 1014-1016, 112 S.Ct. at 2893-94. Plaintiffs argue that the complete evisceration of a single stick in the bundle of property rights--i.e., the right to hunt on one's property--can constitute such a taking. The linchpin of this argument is Plaintiffs' contention that courts can and should analyze each stick in the bundle of property rights separately in order to determine whether the regulation at issue effects a taking of a given stick. See Florida Rock Indus., Inc. v. United States, 18 F.3d 1560, 1572 n. 32 (Fed.Cir.1994) (suggesting that the many variants of property rights should be analyzed separately for a regulatory taking just as is done for a physical taking), cert. denied, --- U.S. ----, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Plaintiffs argue that we must focus only on Section 3's impact on their property "right to hunt." Therefore, Plaintiffs continue, their "right to hunt" is the appropriate denominator for our determination of whether Section 3 deprives them of complete beneficial use of their property.[17] However, we believe that the relevant denominator must be derived from the entire bundle of rights associated with the parcel of land. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662-63, 57 L.Ed.2d 631 (1978); Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987). Thus, we reject the Florida Rock approach and adhere to the more traditional analysis outlined in Penn Central. See 438 U.S. at 130, 98 S.Ct. at 2662 (Regulatory taking jurisprudence "does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."); see also Concrete Pipe & Prods. v. Construction Laborers Pension Trust, --- U.S. ----, ----, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993) (same).[18]
 
 
 28
 When viewed in the context of Plaintiffs' entire bundle of property rights (rather than solely on their assumed right to hunt), Section 3 does not effect a destruction of all beneficial use of Plaintiffs' "parcel as a whole" because Plaintiffs still can "use their property for ranching, farming, and other livestock operations." Clajon, 854 F.Supp. at 851 n. 14. Therefore, we reject Plaintiffs' claim that Section 3 deprived them of all economically beneficially use of their property so as to effect an unconstitutional regulatory taking.[19]
 
 
 29
 b. The "Substantially Advance A Legitimate Governmental Interest" Test
 
 
 30
 Even if Section 3's restriction on hunting--i.e., the two supplementary license limit for large landowners--does not completely deprive Plaintiffs of all economically beneficial use of their property, it still could constitute a taking if it failed substantially to advance a legitimate governmental interest. Agins v. Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The Supreme Court has declined to define precisely the nature of this analysis, explaining that it involves an "essentially ad hoc, factual inquir[y]." Kaiser-Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). However, the Supreme Court clearly has stated that the burden of striking down a generally applicable police power regulation on Takings Clause grounds "properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights." Dolan, --- U.S. at ---- n. 8, 114 S.Ct. at 2320 n. 8 (citing Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)).
 
 
 31
 While the Supreme Court has applied Kaiser-Aetna 's "ad hoc" inquiry to Takings Clause challenges to broad regulatory schemes, two recent cases applying this test in the specific context of development exactions,[20] Nollan v. California Coastal Comm'n and Dolan v. City of Tigard, have explained further that any required dedication of property must have an "essential nexus" and be "roughly proportional" to the burdens imposed on the public by the property owner. Nollan, 483 U.S. at 837, 107 S.Ct. at 3148; Dolan, --- U.S. at ---- - ----, 114 S.Ct. at 2319-20. Thus, before conducting the governmental interest inquiry, we first must determine whether the "essential nexus" and "rough proportionality" tests apply to all regulatory takings claims. Based on a close reading of Nollan and Dolan, we conclude that those cases (and the tests outlined therein) are limited to the context of development exactions where there is a physical taking or its equivalent. See, e.g., Harris v. City of Wichita, 862 F.Supp. 287, 293 (D.Kan.1994) (rejecting the application of Dolan to the restrictions imposed by an Airport Overlay District on the grounds that Dolan did not involve a legislative classification but rather required that the petitioner convey an ownership interest in the land).
 
 
 32
 In our judgment, both Nollan and Dolan follow from takings jurisprudence's traditional concern that an individual cannot be forced to dedicate his or her land to a public use without just compensation. That is, Nollan and Dolan essentially view the conditioning of a permit based on the transfer of a property interest--i.e., an easement--as tantamount to a physical occupation of one's land. See Nollan, 483 U.S. at 832, 107 S.Ct. at 3146 ("We think 'a permanent physical occupation' has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so no particular individual is permitted to permanently station himself upon the premises."); Washington Legal Found. v. Texas Equal Access To Justice Found., 873 F.Supp. 1, 8 (W.D.Tex.1995) (classifying Dolan as a "case[ ] standing for the proposition that property owners may exclude others from their real, or tangible property"). Thus, we believe that Nollan and Dolan are best understood as extending the analysis of complete physical occupation cases to those situations in which the government achieves the same end (i.e., the possession of one's physical property) through a conditional permitting procedure. See Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 379 (2d Cir.1995) ("Dolan protects a landowner's right, in some circumstances, not to be required to surrender his land as a condition of obtaining a permit....").[21] See also Nollan, 483 U.S. at 841, 107 S.Ct. at 3150 (court will be "particularly careful" in cases involving a requirement that an owner deed property because of the likelihood that the purpose of the exaction is "avoidance of the compensation requirement, rather than the stated police power objective"). Given the important distinctions between general police power regulations and development exactions, and the resemblance of development exactions to physical takings cases, we believe that the "essential nexus" and "rough proportionality" tests are properly limited to the context of development exactions. See Dolan, --- U.S. at ----, 114 S.Ct. at 2316 (distinguishing earlier land use/zoning cases from development exaction cases on the ground that exactions are "not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property" to the government).
 
 
 33
 While a property owner does not and should not expect to be forced to dedicate land unrelated to, or disproportionately related to, the burden that he or she imposes on the public, it is well established that a "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." Lucas, 505 U.S. at 1027, 112 S.Ct. at 2899. That is, the Takings Clause allows some property owners to be more burdened by a challenged governmental regulation than others because "[w]hile each of us is burdened somewhat by restrictions, we, in turn, benefit greatly from the restrictions that we place on others." Keystone, 480 U.S. at 491, 107 S.Ct. at 1245.[22] See also Dolan, --- U.S. at ----, 114 S.Ct. at 2316 (acknowledging that " '[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law' ") (quoting Mahon, 260 U.S. at 413, 43 S.Ct. at 159).
 
 
 34
 Wyoming argues that Section 3 substantially advances its legitimate interest in conserving its wild game population while affording its residents a reasonable opportunity to hunt. Because Wyoming's hunting licensing scheme serves a public purpose and promotes the public welfare--i.e., the conservation of and the regulation of the ability to hunt game animals, see Hughes, 441 U.S. at 337, 99 S.Ct. at 1737 (conservation of wild animals is a legitimate local interest similar to health and safety regulation)--we must accept the legitimacy of the state interest behind Section 3. Section 3 substantially advances the legitimate state interest in conserving game animals and affording a reasonable opportunity to hunt to its residents. To the extent that significant numbers of permits to hunt surplus animals are allocated to large landowners, that would substantially impair the opportunity of all Wyoming residents to compete successfully and on an equal basis for big game hunting permits. Hodel v. Irving, 481 U.S. 704, 713, 107 S.Ct. 2076, 2081, 95 L.Ed.2d 668 (1987) ("Government has considerable latitude in regulating property rights in ways that may adversely affect the owners.") (citing Keystone and Penn Central ). Thus, we hold that Wyoming's landowner licensing regulation does not effect a regulatory taking, and therefore, we AFFIRM the district court's grant of Defendants' motion for summary judgment on Plaintiffs' Takings Clause claim.
 
 C. EQUAL PROTECTION CLAUSE CLAIM
 1. Jurisdiction
 
 35
 Because Defendants' ripeness argument as to Plaintiffs' equal protection challenge mirrors their Takings' ripeness argument, we reject this argument for the same reasons outlined in Part B1.
 
 2. Equal Protection Inquiry
 
 36
 Plaintiffs argue that the protection of private property is a fundamental right and thus the analysis of whether their property rights were restricted in violation of the Equal Protection Clause[23] must be based on strict scrutiny. Specifically, Plaintiffs claim that the issuance of two supplemental hunting licenses to both large and smaller landowners does not adequately account for the fact that large landowners support more game animals, and thus, Section 3 discriminates against large landowners in violation of the Equal Protection Clause.
 
 
 37
 We disagree with Plaintiffs' premise that Wyoming's regulations should be subject to strict scrutiny. Economic regulations--i.e., those burdening one's property rights--have traditionally been afforded only rational relation scrutiny under the Equal Protection Clause. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.") (citations omitted). Thus, we agree with the district court that Plaintiffs' equal protection claim must be analyzed under rational basis review rather than strict scrutiny. Clajon, 854 F.Supp. at 855. Because the district court concluded that the limitations on hunting licenses to large landowners could conceivably be based on the goal of balancing the landowners' interest in having some right to hunt on their property with Wyoming's interest in distributing the benefits of its conservationist program throughout the state, it upheld Section 3 under a rational basis review. Id. at 855-856.
 
 
 38
 We must (1) strongly presume that Wyoming's regulatory scheme is constitutional, Heller v. Doe, --- U.S. ----, ----, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); and (2) uphold Section 3 unless it "rests on grounds wholly irrelevant to the achievement of the State's objective," id. at ----, 113 S.Ct. at 2645 (citations and internal quotation marks omitted). Moreover, the state need not articulate its actual objective behind the scheme or submit evidence to support the rationality of the regulation, provided that we can conceive of facts which reasonably justify the classification at issue. FCC v. Beach Communications, Inc., --- U.S. ----, ---- - ----, 113 S.Ct. 2096, 2101-03, 124 L.Ed.2d 211 (1993). Under this deferential standard of review--which is a "paradigm of judicial restraint," id. at ----, 113 S.Ct. at 2101--we have no difficulty in upholding the judgment of the district court.
 
 
 39
 Indeed, Intervenors assist us in this task by offering two justifications for Wyoming's licensing scheme: (1) an overall cap on benefits--i.e., hunting licenses--is an acceptable method of conserving resources, Dandridge v. Williams, 397 U.S. 471, 483-87, 90 S.Ct. 1153, 1160-1162, 25 L.Ed.2d 491 (1970) (upholding cap on welfare benefits per family on equal protection challenge); and (2) the hunting licensing scheme at issue seeks to strike a balance between conservationist policies, affording the public access to hunting rights through a lottery and offering landowners some opportunity to hunt on their land and providing some incentive to landowners to maintain game habitat. See Intervenors' Br. at 45-46.
 
 
 40
 While Plaintiffs argue that the capping of supplemental licenses at two for all persons owning land over 160 acres and the purported balance achieved by the licensing scheme are illegitimate purposes, we must remember that the Equal Protection Clause is not meant to be a tool to second-guess legislative judgments concerning valid public policies or to invalidate classification schemes simply because they are "not made with mathematical nicety or because in practice [they] result[ ] in some inequality." Dandridge, 397 U.S. at 485, 90 S.Ct. at 1161 (internal quotation marks omitted); United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980) ("[I]n cases involving social and economic benefits [the Court] has consistently refused to invalidate on equal protection grounds legislation which it simply deemed unwise or unartfully drawn."). While there are certainly some classifications that are "wholly impossible to relate to legitimate governmental objectives," Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir.1995)--e.g., those based on an "irrational prejudice"[24]--we view the State's effort to balance its conservation policies and desire to offer all of its citizens as well as its large landowners an opportunity to hunt as sufficient to withstand rational basis scrutiny. Thus, we AFFIRM the grant of Defendants' motion for summary judgment on Plaintiffs' equal protection claim.
 
 D. INTERVENORS' REQUEST FOR ATTORNEY'S FEES
 
 41
 We review the district court's rejection of Intervenors' request for attorney's fees under the abuse of discretion standard, Cobb v. Saturn Land Co., Inc., 966 F.2d 1334, 1338 (10th Cir.1992); however, to the extent that the district court's decision was premised on an error of law, we review its judgment de novo, American Council of the Blind of Colorado, Inc. v. Romer, 962 F.2d 1501, 1503 (10th Cir.1992), vacated on other grounds, 506 U.S. 1075, 113 S.Ct. 1038, 122 L.Ed.2d 348 (1993). It is well settled that a "prevailing party" in a 42 U.S.C. Sec. 1983 action may be entitled to reasonable costs and attorneys' fees. 42 U.S.C. Sec. 1988(b). However, a defendant (or an intervenor-defendant[25]) may only recover such fees in a Section 1983 action if the lawsuit was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)).
 
 
 42
 Intervenors contend Plaintiffs' Sec. 1983 action was frivolous, invoking Crabtree v. Muchmore, 904 F.2d 1475 (10th Cir.1990), for support. Not only is Crabtree inapposite to the instant case, but it underscores the rare circumstances in which a suit is truly frivolous so as to warrant an award of attorneys' fees to the defendant. In Crabtree, the plaintiffs sued a judge despite the protection of absolute immunity and based on a property interest which both a state court and federal bankruptcy court had determined did not exist. Id. at 1477-78. In contrast, the instant case presents novel and difficult legal questions whose meritworthiness is underlined by the close consideration that we afford to them. Thus, we reject Intervenors' claim for attorneys' fees and AFFIRM the ruling of the district court.
 
 CONCLUSION
 
 43
 For the reasons set forth above, we DISMISS Plaintiffs' Commerce Clause claim for lack of standing. We AFFIRM the district court's grant of summary judgment to Defendants and its denial of Plaintiffs' motion for partial summary judgment on Plaintiffs' Takings and Equal Protection Clause claims. Finally, we AFFIRM the district court's ruling that Intervenors are not entitled to attorneys' fees.
 
 
 
 *
 The Honorable Arthur L. Alarcon, Senior Circuit Court Judge for the United States Court of Appeals of the Ninth Circuit, sitting by designation
 
 
 [1]
 Plaintiffs originally sued the State of Wyoming and the members of the Wyoming Game and Fish Commission (the "Commission") in their official capacity. However, after the original defendants filed a motion to dismiss the action on Eleventh Amendment grounds, Plaintiffs amended their complaint to name the members of the Commission as well as the Director and the Chief Game Warden of the Wyoming Game and Fish Department as individuals (collectively "State Defendants"). See Clajon v. Petera, 854 F.Supp. 843, 846-47 (D.Wyo.1994). Thus, the district court viewed the State Defendants' motion to dismiss as moot. See id. at 847 n. 3
 
 
 [2]
 Because the two appeals present related issues, we consolidated Plaintiffs' appeal of their federal constitutional claims, No. 94-8071, with Intervenors' appeal of their request for attorneys' fees, No. 94-8103. While we heard oral argument on No. 94-8071, after examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs on No. 94-8103. See Fed.R.App.P. 34(f); 10th Cir.R. 34.1.9. That case is therefore ordered submitted without oral argument
 
 
 [3]
 Plaintiffs do not appeal the dismissal of their state constitutional law claims or the dismissal of their contention that the state's claim to ownership of all animals in the state in and of itself constitutes an unconstitutional taking and violation of the Commerce Clause
 
 
 [4]
 One cannot lawfully hunt big game in Wyoming without a license. See Wyo.Stat. Sec. 23-3-102 (Supp.1994)
 
 
 [5]
 The areas of the state subject to the challenged hunting limitations, including the land owned by Plaintiffs, are referred to as "limited quota areas." See Clajon, 854 F.Supp. at 849
 
 
 [6]
 Wyo.G & F Dept. Chap. XLIV Sec. 3 provides, in relevant part, that:
 Only two licenses per species may be issued to a landowner or the landowners's immediate family or a corporation regardless of the number of landholdings which meet the qualifications.
 In order to qualify for a license issued pursuant to this section, the deed land of the landowner or corporation must consist of at least 160 contiguous acres in Wyoming, must be assessed as agricultural land on the county tax roll, and must be utilized by the species of game for which the license is applied to the extent the land provides food, cover and water, and can exhibit at least 2,000 days use by the species during the 12 months prior to application....
 (a) In elk, deer, antelope or wild turkey hunt areas where licenses are issued totally as limited quota, landowners within the designated hunt area may be issued limited quota elk, deer, antelope or wild turkey licenses. Only two limited quota licenses for each species qualified for will be allowed to a person and one member of the immediate family. For lands held in title as a corporation, no more than two landowner licenses per species qualified for may be issued separate landholdings. When corporations own lands in more than one limited quota area, the corporation is only entitled to two licenses per species qualified for. They may choose two licenses in one qualified area or one license in each of two qualified areas. Such licenses shall be issued only to a member of the corporation of their immediate families....
 Aplt.App. at 64; Aplt's Br. at 3. We note that while these regulations were promulgated under the Commission's plenary authority, see Chap. XLIV Sec. 1, the Wyoming legislature specifically directed the Commission to promulgate rules governing the issuance of certain big game licenses to Wyoming landowners "without subjection to prescribed means of competitive public issuance [i.e., the lottery system]." Wyo.Stat.Ann. Sec. 23-1-302(h) (Supp.1995). Thus, Section 3 also reflects the Commission's response to this directive.
 
 
 [7]
 Wyo.G & F Dept. Chap. XLIV Sec. 5 provides, in relevant part, that: "In limited quota areas, 80 percent of deer, antelope, mountain lion and wild turkey licenses and 84 percent of elk licenses are reserved for residents."
 Wyo.G & F Dept. Chap. XLIV Sec. 6 provides, in relevant part, that: "In limited quota areas, 20 percent of deer, antelope, mountain lion and wild turkey licenses are reserved for nonresidents, and 16 percent of elk licenses are reserved for nonresidents."
 
 
 [8]
 Plaintiff Clajon Corporation owns in excess of 90,000 acres, Plaintiff Scotts own over 8,400 acres and lease several thousand other acres, and Plaintiff Salt Creek Ranch owns over 40,000 acres. See Clajon, 854 F.Supp. at 846
 
 
 [9]
 Defendants not only challenge the basis of Plaintiffs' substantive claims and their standing to assert them, but also argue that (1) Plaintiffs' claims are not judicially redressable because the design of Wyoming's hunting licensing scheme is committed to other branches of government; and (2) Plaintiffs have not stated a claim under Sec. 1983 because the Wyoming Game & Fish Commissioners cannot be sued in their individual capacities for executing their statutory duties
 We reject the first argument because it misunderstands the role of the judiciary. Intervenors assert that the federal courts should not redesign the licensing scheme because "resolution of these complex issues involves legislative and executive decisions beyond the province of the federal courts." Intervenors' Br. at 9. However, "[i]t is, emphatically, the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803), and to grant an injunction to prevent legislatures or executives from making or implementing unconstitutional decisions, see Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908). As to the second argument, we reject it because Ex parte Young clearly provides that state officials can be sued in their individual capacities--even if merely performing clear statutory duties--for injunctive and declaratory relief. See id. at 159-60 & 167, 28 S.Ct. at 453-54 & 457 ("The State cannot [grant] official immunity from responsibility to the supreme authority [i.e., the Constitution].").
 
 
 [10]
 The United States Constitution provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several states." Art I, Sec. 8, cl. 3
 
 
 [11]
 Defendants also contest Plaintiffs' standing to challenge Sections 5 and 6 on the ground that Plaintiffs do not have a "legally protected interest" within the scope of the Commerce Clause. Although we ultimately conclude that Plaintiffs lack standing, we reject Defendants' suggestion that an individual litigant has no legally protected interest under the Commerce Clause. The Commerce Clause provides a cause of action--i.e., a legally protected interest--to any person injured by discrimination against, or by an unreasonable burden upon, interstate commerce, Dennis v. Higgins, 498 U.S. 439, 450, 111 S.Ct. 865, 872, 112 L.Ed.2d 969 (1991), even if that person's injury is indirect, see Wyoming v. Oklahoma, 502 U.S. 437, 448-54, 112 S.Ct. 789, 797-800, 117 L.Ed.2d 1 (1992) (interest in collecting tax revenues sufficient to confer standing to bring Commerce Clause challenge). Furthermore, Defendants are mistaken that the Commerce Clause protects only nonresidents from state regulations that excessively burden commerce. In-state residents may also assert a Commerce Clause challenge although, of course, they have the same burden to establish standing as have out-of-state residents, see Oregon Waste Sys. v. Department of Env. Quality, --- U.S. ----, ----, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (in-state landfill operators entitled to challenge their own state's regulations burdening interstate commerce and their ability to provide commercial services to nonresident customers); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)
 
 
 [12]
 Plaintiffs have also offered evidence that the scheduling of the permitting application process makes it difficult for nonresidents to plan hunting trips to Wyoming. See Scott Aff. at p 15, Aplt.App. at 313-14. However, as Plaintiffs have not challenged the timing of the general licensing scheme, we do not view this evidence as relevant to Plaintiffs' case
 
 
 [13]
 Indeed, given the absence of any specific evidence of a less favorable success rate in receiving hunting licenses among nonresidents, it is possible that the separate quota scheme actually favors nonresidents and benefits rather than burdens both interstate commerce and Plaintiffs' business by reserving a higher percentage of the total available licenses for out-of-state applicants then they otherwise would receive in a single lottery. It is not self-evident that a nonresident quota scheme will always disadvantage nonresidents. See Terk v. Ruch, 655 F.Supp. 205, 207 (D.Colo.1987) (indicating that the success rate of applications for licenses to hunt mountain goats was higher for nonresidents than for residents)
 
 
 [14]
 Because we lack jurisdiction to adjudicate Plaintiffs' Commerce Clause challenge, we reject Plaintiffs' argument that the state's failure to move specifically for summary judgment on Count IV (the Commerce Clause claim) requires a remand for further proceedings. The Supreme Court has stated that "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' " FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)) (alteration in original). However, we note that while Defendants' summary judgment motion did not focus on Plaintiffs' Commerce Clause challenge to the permitting scheme, the motion was directed to the entire complaint, Aplt.App. at 18, and the memorandum in support thereof explicitly asked for "summary judgment dismissing Plaintiffs' amended complaint in its entirety...." Aplt.App. at 35. We also note that Plaintiffs themselves sought summary judgment under Count IV, and although they focused on a different theory than did Defendants, both questions involved precisely the same evidence. Finally, and most importantly, Intervenors explicitly argued in favor of summary judgment against Plaintiffs on Count IV and Plaintiffs responded to Intervenors' argument both in a reply brief and at oral argument. See Aplt.App. at 522-526 (Intervenors' argument); id. at 534-35 (Plaintiffs' response)
 
 
 [15]
 The Takings Clause provides "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This restriction is applicable to the states through the Fourteenth Amendment. Chicago B. & Q.R. Co. v. Chicago, 166 U.S. 226, 241, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897)
 
 
 [16]
 Montana has opined on the extent of a property owner's right to hunt in a somewhat similar context. Specifically, the Montana Supreme Court held that a statute which authorized persons using navigable waters to engage in big game hunting between high water marks was unconstitutional because it infringed on the right to hunt of private landowners. See Galt v. State Dep't of Fish, Wildlife and Parks, 225 Mont. 142, 731 P.2d 912, 916 (1987). The court explained that, because the "real property interests of private landowners are important as are the public's property interest in water," and that both are constitutionally protected, the public's easement in the right to use water for recreational purposes must be narrowly construed. Id
 
 
 [17]
 As the Supreme Court explained in Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987), a critical question in a regulatory takings inquiry is defining the unit of property whose value furnishes the denominator of the fraction for the economically beneficial use analysis
 
 
 [18]
 Plaintiffs' attempt to invoke Dolan v. City of Tigard, --- U.S. ----, ----, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304 (1994), for support is unavailing as Dolan only discusses the importance of a single stick in the bundle of property rights in the context of the Court's analysis of whether the regulation substantially advanced a legitimate governmental interest. In fact, when considering the economically beneficial use test, Dolan clearly indicated that test must be viewed in light of defendant's entire property. At ---- n. 6, 114 S.Ct. at 2316 n. 6
 Furthermore, Plaintiffs' reference to Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), is inapposite. Beckwith involved the state's physical taking of all interest accrued from interpleader funds. Thus, Beckwith does not bear upon the economically beneficial use analysis of a regulatory takings case.
 
 
 [19]
 Because we reject Plaintiffs' contention that the complete deprivation of the right to hunt could constitute a deprivation of all beneficial use, we do not reach Defendants' counter-arguments that Plaintiffs (1) were justly compensated for any deprivation of their right to hunt--e.g., through the two hunting licenses; and (2) were not deprived of their investment backed expectations in the property, see Lucas, 505 U.S. at 1026-28, 112 S.Ct. at 2899 (no taking if proscribed use not part of original title); Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659 (investment-backed expectations are to be considered in discerning the value of the original title). However, we note that Plaintiffs purchased their property after the enactment by Wyoming of its general hunting license regulatory scheme
 
 
 [20]
 "Development exactions" are where a governmental agency requires that a property owner dedicate some of his or her land for public use before granting that property owner a permit to develop the land. This "exaction" of land often involves the actual deeding of some of the property to the public--either in the form of an easement or an outright transfer of the land
 
 
 [21]
 It is instructive that Keystone--decided in the same year as Nollan--downplayed the need for any nexus requirement in considering the constitutionality of a general regulation and focused on the need for a legitimate police power justification. See 480 U.S. at 490, 107 S.Ct. at 1244. Moreover, the Nollan Court explained that takings jurisprudence has accepted that a "broad range of governmental purposes and regulations" satisfy the "substantially advance legitimate state interest" requirement. Nollan, 483 U.S. at 834-35, 107 S.Ct. at 3147
 We note that commentators have also underscored that Nollan and Dolan are and should be limited to the context of development exactions. See, e.g., Christopher J. St. Jeanos, Note, Dolan v. Tigard And The Rough Proportionality Test: Roughly Speaking, Why Isn't A Nexus Enough, 63 Fordham L.Rev. 1883, 1886 (1995) ("As a result of the Nollan and Dolan cases, a municipality must be able to justify using its land-use power to demand exactions by showing that the exaction required is limited to a harm caused by the development."); Leading Cases: Takings, 108 Harv.L.Rev. 139, 297 & n. 48 (1994) (noting that the cases' reliance on the unconstitutional conditions doctrine suggests that courts will limit the tests to cases involving development exactions and that "[l]ower courts have already distinguished the situation in Nollan from regulatory schemes that did not call for any physical invasion."); Dwight H. Merriam & R. Jeffrey Lyman, Dolan v. Tigard: Study Materials, C90 ALI-ABA 321, 326 (1994) ("Dolan (and Nollan before it) was concerned with a dedication of an interest in land (as in deeding an easement), not the regulation of the use of land.").
 
 
 [22]
 In explaining why the New York City landmarks law, which did not impose identical burdens on all structures, was not an unconstitutional taking, the Supreme Court highlighted the importance of a regulation serving a public purpose and noted that:
 It is, of course, true that the Landmarks Law has a more severe impact on some landowners than others, but that in itself does not mean that the law effects a "taking." Legislation designed to promote the general welfare commonly burdens some more than others. The owners of the brickyard in Hadacheck [v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) ] of the cedar trees in Miller v. Schoene, [276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) ] and of the gravel and sand mine in Goldblatt v. Hempstead, [369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) ] were uniquely burdened by the legislation sustained in those cases.
 Penn Central, 438 U.S. at 133, 98 S.Ct. at 2664.
 
 
 [23]
 The Fourteenth Amendment provides, in relevant part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV Sec. 1
 
 
 [24]
 See, e.g., Cleburne, 473 U.S. at 450, 105 S.Ct. at 3259 (classifications based on an "irrational prejudice" must be struck down as violative of equal protection)
 
 
 [25]
 An intervenor must also demonstrate that it played a "significant role" in the litigation and contributed "nonduplicative efforts" in order to recover its attorneys' fees. Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1535 (9th Cir.), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985); Wilder v. Bernstein, 965 F.2d 1196, 1205 (2d Cir.1992), cert. denied sub nom. New York City Dept. of Human Resources v. Abbott House, 506 U.S. 954, 113 S.Ct. 410, 121 L.Ed.2d 335 (1992)